407 So.2d 759 (1981)
Helen Ann FOSTER, Plaintiff-Appellant-Appellee,
v.
HOUSTON GENERAL INSURANCE COMPANY; Inez Grant; Morehouse Parish School Board; Horace Mann Insurance Company and Lloyd Gray, Defendants-Appellants-Appellees.
No. 14664.
Court of Appeal of Louisiana, Second Circuit.
November 2, 1981.
Writ Denied January 18, 1982.
*761 McLeod, Verlander & Dollar by David E. Verlander, III, and Robert P. McLeod, Monroe, for plaintiff-appellant-appellee, Helen Ann Foster.
Hayes, Harkey, Smith & Cascio by Charles S. Smith, Monroe, for defendants-appellants-appellees, Houston General Ins. Co. and Morehouse Parish School Bd.
Snellings, Breard, Sartor, Inabnett & Trascher by Kent Breard, Monroe, for defendants-appellants-appellees, Horace Mann Ins. Co., Inez Grant and Lloyd Gray.
Before HALL, JASPER E. JONES and FRED W. JONES, JJ.
FRED W. JONES, Judge.
The mother of a mentally retarded youngster sued two school teachers and their insurer, the employer-school board and its insurer, and an automobile driver for the wrongful death of her son. Judgment was rendered in favor of plaintiff against all defendants except the car operator. The parties cast in judgment appealed, contending that the trial judge erred in (1) finding the school teachers were guilty of negligence which resulted in the student's accident and death and (2) concluding the deceased student was not contributorily negligent and/or did not assume the risk.
Plaintiff also appealed, asserting that the trial judge should have found the school board independently negligent rather than simply liable as the employer of the negligent teachers, and further asked for an increase in the damage award.
We affirm.
On December 2, 1977 Robert Foster, age 17, was a student at the Morehouse Educational Development Center ("MEDC") in Bastrop, a school for the mentally retarded operated by the Morehouse Parish School Board. Foster had been admitted to MEDC in 1968 upon the basis of tests which indicated he was an educable mentally retarded youngster. He was again tested in 1975, when he was 15, and found to have an IQ of 52 and a mental age of seven years four months. This result placed him in the bottom range of the educable mentally retarded.
In 1977 Foster was chosen a member of MEDC's Special Olympics[1] basketball team. This was a school sanctioned activity, with practice sessions held during the regular physical education class period. Mrs. Inez Grant, the only physical education teacher at MEDC, was in charge of and responsible for the training of the team in its preparation for regional competition. She had been employed by the Morehouse Parish School Board for some 26 years and was in her second year at MEDC. Mrs. Grant was assisted by Lloyd Gray, a mathematics teacher, also in his second year at MEDC.
MEDC did not have a gymnasium. Although the junior high school with which it shared a campus did have such a facility, it was in constant use during regular school hours and was not available to the MEDC physical education classes. Consequently, Foster's basketball team usually practiced outdoors on MEDC's dirt court. However, because she felt it was desirable for the team to have experience playing indoors on a wood floor, Mrs. Grant arranged for the boys to practice on December 2, 1977 in a gymnasium located in Dotson Park, a municipal facility located about three blocks from the MEDC campus.
As shown on the appended sketch, the MEDC campus was bounded on the north by West Madison Street (U.S. Highway 165) and on the west by South Haggerty Street. A chain link fence encircled the campus, *762 with a gate on the west side for ingress and egress. The juncture of South Haggerty Street and West Madison Street formed a T-intersection which was controlled by a traffic semaphore signal. About half a block to the west of that intersection Parker Drive joined West Madison Street from the north, forming another T-intersection, which was controlled only by a stop sign on Parker Drive. Parker Drive extended north into Dotson Park.
There were no paved sidewalks along the streets in that area. At the time West Madison Street was a two lane blacktop street. It was one of Bastrop's principal thoroughfares, with a traffic count on the portion inside the city limits during one 24 hour period of 14,050 vehicles.
Mrs. Grant and Gray planned to take the basketball team from MEDC to Dotson Park sometime during the lunch hour. Because of the relatively short distance they decided to walk rather than seek bus transportation from the school board.[2] The route selected for the three-block walk exited the MEDC campus at the gate next to South Haggerty Street, crossed that street in the middle of the block, angled across an adjoining churchyard to a point on West Madison Street opposite Parker Street, crossed West Madison Street in the middle of that block (some 150 feet west of the traffic signal) and ran up the side of Parker Street to the park facility. Neither Mrs. Grant nor Gray had ever taken the basketball team to Dotson Park along this route. In fact, it was established that the MEDC teachers and students had only used the Dotson Park facilities once before, and that was for a picnic the year prior to the date in question.
Between 12:30 and 12:45 P. M., Gray gathered the team of 10 or 11 boys in a back building at MEDC and sent word to Mrs. Grant, who was teaching a class in the front building, that they were ready to go to Dotson Park. Mrs. Grant instructed them to wait for her to finish the class in progress. During this time Gray discussed with the youngsters safety precautions, particularly directed at street crossing. Since Mrs. Grant still had not joined them, Gray moved the group to the vicinity of her classroom. He said that the students were becoming increasingly "fidgety". Therefore, Mrs. Grant was advised that Gray would take the team to Dotson Park alone. Mrs. Grant assented and stated that she would follow in her automobile.
Gray departed with the team along the planned route. After they crossed South Haggerty Street and were traversing the churchyard, five or six of the boys broke away from the group and started running ahead, paid no heed to admonitions from Gray, and crossed West Madison Street on their way to the park. Gray then rejoined the remaining group of five students which included Foster, led them up to West Madison Street, and lined up the youngsters parallel to the street to wait for an opportune moment to cross.
At that time traffic in the eastbound lane faced a red light at the West Madison Street-Haggerty Street intersection and was backed up past the place where Gray and his contingent were standing. Confronted with this situation, Foster suddenly dashed out into the street, ran between two stationary vehicles in the eastbound lane, got into the westbound lane and looked to his right, saw a car coming in that lane and stopped suddenly, at which time his feet slid out from under him. The youngster was run over by the oncoming automobile, suffering the serious injuries from which he died three days later.
In his written opinion the trial judge absolved the defendant driver of the car which ran over Foster of liability, concluding that the accident was unavoidable as far as the vehicle operator was concerned. However, he found that Mrs. Grant was negligent because of "her failure to provide other transportation, her failure to supervise, her negligent choice of a route to the *763 park and her failure to adequately instruct the students." The trial judge also determined that Gray was negligent by virtue of his "failure to provide alternate transportation, his failure to wait for Grant before undertaking the trip, his failure to adequately instruct or supervise the students, and his failure to maintain control over the students." The negligence of the two teachers was deemed to have been the proximate cause of Foster's accident and ensuing death. No independent negligence was found on the part of the school board, but it was held liable for the negligence of its employees under the doctrine of respondeat superior. The defense that Foster was contributorily negligent and/or assumed the risk was rejected.
Cases dealing with the tort liability of school personnel in which inadequate supervision is an issue generally discuss these two distinct questions: (1) Under the facts of the case, what duty of supervision was owed to the injured student? (2) Was that duty reasonably satisfied by the conduct of the supervisory personnel? See Annotation, Public Schools-Torts-Supervision, 38 A.L. R.3rd 830.
It follows, then, that the first legal issue presented for consideration in this case involves an inquiry concerning the nature of the duty owed by Mrs. Grant and Gray to Foster with respect to this trip from the MEDC campus to Dotson Park. At the beginning it is appropriate to focus upon the limitations and handicaps of this particular student. According to an evaluation report prepared in 1968, Foster was referred for testing because:
"He doesn't seem to be able to follow simple directions. Auditory perception poor (doesn't respond when called on only sometimes). His attention span is too short."
Reasons for referral in 1975 were substantially the same.
During his entire life Foster had resided with his mother in Collinston, a rural Morehouse Parish village, where there was considerably less traffic than in Bastrop.
In summary, on the date in question Foster was a 17 year old with a mental age of about 7 or 8 years, possessing poor auditory ability and a short attention span, who experienced difficulty in following simple instructions, and who had limited experience in coping with heavy vehicular traffic.
This individual was being taken with some ten other youngsters with varying degrees of mental retardation along a three block route which required the crossing of a heavily traveled thoroughfare, with all of the usual attendant hazards.
Because of the special relationship existing between them and their students, teachers on campus are under a general duty to conduct their classes so as not to expose their students to unreasonable risk of injury. Green v. Orleans Parish School Board, 365 So.2d 834 (La.App.4th Cir.1978). That duty becomes more onerous when the student body is composed of mentally retarded youngsters. See Gonzalez v. Mackler, 19 A.D.2d 229, 241 N.Y.S.2d 254 (1963). Recognition of that duty was manifested in this case by the testimony of Mrs. Grant that she collected the children for her physical education class by going to each room, getting the children, taking them to the physical education class and then taking them back to their rooms. Needless to say, this is not the practice with adolescent students in the average school.
It is recognized that on-campus care of mentally retarded students does not require continuous supervision. Hunter v. Evergreen Presbyterian Vocational School, 338 So.2d 164 (La.App.2d Cir.1976). However, once the decision was made in this case to take the Special Olympics team off campus on a walking trip across a heavily traveled thoroughfare, the personnel responsible for the team had a duty to maintain closer supervision over the youngsters than if they had remained on-campus.
Under this particular factual situation, what was the duty of Mrs. Grant and Gray? First, their duty was to have had an adequate number of supervisory personnel accompany the team to assure that the *764 youngsters were kept under control and protected from hazards that might be encountered going to and coming from the park. Further, the accompanying personnel were under a duty to maintain close supervision over the students at all times, particularly when they were in the vicinity of moving vehicles. Second, the defendant teachers had the duty to choose the safest walking route from the MEDC campus to Dotson Parki.e., the route along which the students would be exposed to the fewest traffic hazards.
Having delineated the duty of Mrs. Grant and Gray, the next question is: was the requirement of the performance of this duty designed to safeguard against the risk involved in this casethat Foster might ignore instructions and dash into the street in front of an oncoming car? Put another way, should these teachers have foreseen the likelihood that an adolescent with a mental age of 7 or 8 years might act impulsively as did Foster?
"Foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful man would take account of it in guiding practical conduct." Annotation, Negligence-Causation-Foreseeability, 100 A.L.R.2d 942.
Mrs. Grant and Gray had under their care a group of youngsters who were understandably excited about an excursion off-campus to practice basketball. The extended wait for Mrs. Grant simply heightened that nervous tension. In this situation there would have been difficulty in controlling a group of normal adolescents, much less one composed of those whose physical energies matched their chronological ages but who have the self-control and judgment of much younger children. Foster had poor auditory reception and a short attention span. As a result, the effectiveness of any oral safety instructions given to him prior to embarking on the trip would have been limited. We find, therefore, that the likelihood of a youngster in this category yielding to an impulse by running across the street in the path of an oncoming vehicle should have been anticipated or foreseen. After all, this was basically the reason why the students were not sent by themselves without any accompanying supervisory personnel. For this reason, we conclude that this risk was within the ambit of the duty imposed upon the defendant teachers.
This brings us to the final question: did the defendant teachers breach their duty by failing to act reasonably under the circumstances? We answer in the affirmative. First, the group was not accompanied by a sufficient number of supervisory personnel.[3] This was evidenced by the precipitating event in this tragic dramaGray's loss of control of the group in the churchyard and the headlong dash of several students on across West Madison Street in disregard of their "safety instructions" and Gray's shouts. The mere presence of an adequate number of qualified supervisory personnel could have prevented the initial breakup of the team, particularly if the supervisors had been placed in strategic positions among the students. Next, in the crucial approach to West Madison Street, accompaniment by a sufficient number of supervisory personnel would have enabled continued control of the youngsters. At least one teacher would have been available to stand in the street and halt traffic and the other or others could have guided the students across the thoroughfare.
Mrs. Grant, who was in charge of the planned practice session, permitted Gray to take the children on the walking trip alone. This constituted a breach of her duty. Gray embarked upon the trip without needed additional supervisory personnel and lost control of the group, thereby breaching his duty.
We also find from our examination of the record that the defendant teachers breached *765 their duty by failing to select the safest route from the MEDC campus to the municipal park. Rather than crossing West Madison Street at its controlled intersection with South Haggerty Street, Mrs. Grant and Gray chose to cross West Madison Street at an uncontrolled crossing. The traffic signal light at the controlled intersection was operating on such a sequence that, at one point, it would be red for eastbound traffic but green for westbound traffic. This occurred at the time of the accident. A mentally retarded youngster, observing traffic stopped in the eastbound lane, would have no reason to realize that traffic in the other lane might be moving on a green light. In that sense we agree with the trial judge that this particular crossing could have constituted a "trap" for these youngsters. On the other hand, if the students had been led across West Madison Street at the controlled intersection, at a point east of the traffic signal light, a red light would have shown simultaneously on both sides of the traffic light. Consequently, this would have been the safest place to cross the heavily traveled street.
To summarize, the defendant teachers owed Foster a legal duty, the nature of which was determined by their relation to him, his mental retardation and the hazards to which he would be exposed on the walking trip. This duty was designed to protect Foster from his own impulsive acts and, specifically, the risk that he might do precisely what he did in this caserun into the street in front of a car. Last, the defendant teachers breached their duty by failing to act reasonably under the circumstances failing to provide an adequate number of supervisory personnel, and failing to select the safest route for the walk.
Defendants argue that plaintiff's claim is barred by her son's contributory negligence; that the sole proximate cause of his death was his sudden dash into the street in violation of Gray's instructions; and that nothing less than continuous supervision, including personal restraint, could have prevented Foster's precipitated act.
As explained, this is the type of risk which the duty imposed upon the defendant teachers was designed to protect against. Experience teaches that the mere presence of adequate adult supervisory personnel tends to curb the recognized proclivity of immature children to act impulsively and to protect them against their own folly. It would be illogical to then bar plaintiff's action because her mentally retarded son engaged in conduct which his teachers were under a duty to guard against. For this reason the defense of contributory negligence and/or assumption of risk is without merit.
We agree with the trial judge that the defendant school board was not guilty of independent negligence. It was under no duty to build a separate gymnasium for the use of MEDC students. Whether it should have provided bus transportation is not at issue since there was no evidence that the defendant teachers made such a request. The record shows that the school board issued a safety manual for the guidance of school personnel for trips of this nature.
In her appeal plaintiff asks that the trial judge's award for her son's pain and suffering[4] be increased from $10,000 to $15,000, and that the award for the loss of her son's love and affection be increased from $40,000 to $50,000. Our review of the record convinces us that these awards do not constitute an abuse of the trial judge's broad discretion in this area.
For the reasons set forth, we affirm the judgment of the district court at defendants-appellants' cost.
*766 
NOTES
[1] Athletic competition organized exclusively for the handicapped.
[2] There was some evidence of a school board policy that bus transportation would not be available for short trips of this nature.
[3] Mrs. Grant and Gray appeared to recognize the importance of this requirement since they concededly testified falsely in discovery depositions that both actually accompanied the team on the walking trip.
[4] Foster's injuries included facial fractures, a fractured collarbone, fractured ribs, a fractured pelvis, and a damaged spleen which had to be removed. He lived for three days after the accident, was conscious at least part of this time and doubtless suffered considerable pain and discomfort.