415 So.2d 437 (1982)
Sardo PALERMO, et al.
v.
ALLSTATE INSURANCE COMPANY, et al.
No. 14803.
Court of Appeal of Louisiana, First Circuit.
May 25, 1982.
*438 Victor Marcello, Donald Carmouche, Donaldsonville, for plaintiffs & appellees.
Anthony Clesi, Jr., Baton Rouge, for Allstate Ins. Co. appellee.
J. Arthur Smith, III, Baton Rouge, for Willie Dunn appellee.
David K. Balfour and William J. Doran, Jr., Baton Rouge, for DOTD-State of La. appellant.
Before COVINGTON, COLE and WATKINS, JJ.
COVINGTON, Judge.
The State of Louisiana, Department of Transportation and Development, defendant, appeals the judgment rendered by the trial court against it in favor of plaintiffs, Roy Dimm, Wilson Lewis, Sadie Lewis, Sardo Palermo, Mary Palermo, and Sharon Dimm Rousseau. Sardo and Mary Palermo answered the appeal, questioning the trial court's dismissal of their claim for certain damages.
This is a suit to recover damages for personal injuries and for wrongful death arising out of a collision on September 15, *439 1978, between a 1975 Ford Pinto station wagon driven by Sharon Dimm Rousseau, and a tractor-trailer truck, owned by Matlack, Inc. and driven by Willie Dunn, an employee of Matlack, on Louisiana Highway 1, a two-lane highway, in the Parish of Iberville, near Plaquemine, Louisiana. Passengers in the Pinto automobile included Glinda Palermo Dimm Steib, Roy Dimm, Jr., Randy Dimm and Grover C. Lewis.
Immediately prior to the accident, the Matlack truck was proceeding in a northerly direction on the two-lane highway, and the Rousseau vehicle was going in a southerly direction. The accident allegedly occurred in the northbound lane of traffic when the Rousseau vehicle swerved into the truck's lane of traffic after striking a large, deep hole or rut immediately adjacent to the paved portion of the roadway. The way in which the accident happened is one of the facts in dispute. Only the drivers of the two vehicles, Dunn and Rousseau, survived the collision. All of the passengers in the Pinto were killed. There were no passengers in the truck.
The claimants in the suit are Sardo Palermo and Mary Palermo, the parents of Glinda Steib,[1] Roy Dimm, the father of Roy, Jr. and Randy Dimm, both minors, Sharon Dimm Rousseau, and Wilson Lewis and Sadie Lewis, the parents of the minor, Grover C. Lewis.[2] The suit was instituted against Allstate Insurance Company, insurer of Sharon Rousseau; the Travelers Indemnity Company, insurer of the Lewises; State Farm Mutual Automobile Insurance Company, insurer of Roy Dimm; Willie Dunn, the driver of the Matlack truck; Matlack, Inc., Dunn's employer; and the State of Louisiana through the Department of Transportation and Development, Office of Highways. By supplemental petition, Ford Motor Company was also made a defendant. Travelers, State Farm and Allstate were dismissed on motion by plaintiffs; summary judgments were granted in favor of Ford Motor Company, Matlack, Inc., and Willie Dunn. Thus, the various claims against all defendants, except DOTD, were settled prior to trial.
Plaintiffs asserted at the trial that the collision was caused by a large, deep rut on the southbound shoulder of Highway 1, approximately 6-7 inches in depth, located in the vicinity of the point of impact. DOTD denied that the road condition was substandard and that the road condition caused the accident; and alleged that the accident was caused by the negligence or contributory negligence of Sharon Rousseau.
After trial of this suit, the trial court found liability on the part of the State of Louisiana, Department of Transportation and Development, pursuant to LSA-C.C. art. 2317. The lower court found no negligence on the part of Sharon Rousseau. The court awarded Roy Dimm the sum of $100,000.00 for the wrongful death of his two minor children, Roy Dimm, Jr. and Randy Dimm; and Wilson Lewis and Sadie Lewis, the sum of $50,000.00 each for the death of the minor, Grover C. Lewis. Funeral expenses were also awarded to these plaintiffs.
With regard to the claim of Sardo and Mary Palermo, the trial court found that Glinda Steib, although legally separated from Farrell Steib, was still married to him, so that he was considered a surviving spouse under LSA-C.C. art. 2315; hence, the claim of the Palermos, as surviving parents, for the death of their daughter, Glinda Steib, was dismissed. Concerning the claim of the Palermos as beneficiaries of the Estate of Glinda Steib, the trial court *440 found that Mrs. Steib survived her minor children, so that, as her beneficiaries, her parents were entitled to the sum of $100,000.00, which is the sum the mother (Mrs. Steib) would have been awarded for the deaths of her minor children, Roy, Jr. and Randy Dimm.
The court awarded Sharon Rousseau the sum of $400,000.00 in general damages, $278,956.00 for loss of future earnings, and $3,422.84 for loss of wages. In addition, she was awarded $23,582.24 for medical expenses. The court taxed DOTD for all costs, including cost of depositions used at the trial and cost of expert witness fees.
In reaching its conclusion that DOTD was liable, the trial judge, in his reasons for judgment, made the following factual findings:
"Plaintiffs' theory of the case is that the accident was caused by a large rut on the southbound shoulder approximately six inches in depth located near the point of impact. Mr. Dunn, the driver of the truck, testified that prior to the accident he saw the Pinto vehicle go out of control and slide sideways into his lane of traffic. Due to a serious brain injury suffered in the accident Sharon Rousseau has no memory whatsoever of the events immediately prior to or following the accident. The only other witnesses to testify were Janice and Richard Stone who were traveling immediately ahead of the Pinto at the time of impact. Their testimony was to the effect that after reaching a point parallel to the trailing edge of the tractor-trailer vehicle being driven by Mr. Dunn at a time when they were driving at approximately 45 miles per hour, they heard the impact, looked back, and noted sparks apparently caused by the collision.
"The plaintiffs offered the testimony of Colonel Joseph Andre, an accident reconstruction expert, who based upon this testimony and physical evidence concluded that the rut on the shoulder of the road was the cause in fact of the accident. His opinion was that Sharon Rousseau was trapped in the rut and in an attempt to extricate her vehicle therefrom, she oversteered and went into a broadside skid.
"The defendant offered the testimony of Drs. Ivey and Dart, also accident reconstruction experts, who reached a contrary conclusion. Their opinion was that the Pinto was executing a U-turn at the time of the accident.
"After considering carefully the various theories posed by these respected experts, and after considering the factual evidence and testimony in the record, the court concludes that Colonel Andre's opinion is the most likely and feasible one under all of the evidence. Dr. Ivey, who possessed impressive qualifications, testified that there were only two possible causes in fact of the accidentthese being the `rut' theory and the `U-turn' theory. He admitted under cross examination that his U-turn theory would have to be disregarded if the testimony of Janice and Richard Stone was accepted as factually correct for the reasons that in order to execute a U-turn the Pinto would have been compelled to slow substantially thus lengthening the distance between it and the Stone vehicle far in excess of that testified to by the Stones. The court was impressed with the testimony of the Stones who were the only two disinterested fact witnesses to testify and the court believes their testimony to be credible and reliable.
"Both Dr. Ivey and Dr. Dart relied heavily on the absence of what were termed `yaw marks'. However, both Colonel Andre and Dr. Jack Humphries testified that the accident could have been caused by the rut without the appearance of perceptible yaw marks. Dr. Humphries also noted that the right front tire of the Rousseau vehicle exhibited evidence of melting consistent with a broadside skid orientation. He also pointed to marks on the tire which were consistent with an attempt on the part of Rousseau to re-enter the road from the shoulder.
"The testimony of the truck driver to the effect that he saw the Pinto lose control and slide sideways into his vehicle is also consistent with the rut theory. If the *441 vehicle were executing a U-turn it would not have been in a broadside skid. Furthermore, physical facts discovered subsequent to the accident, such as the position of the rut in relation to the point of impact, the depth of the rut and the appearance of the vehicles following the collision as well as the markings on the right front tire of the Rousseau vehicle are all substantiating factors in favor of the rut theory.
"While the issue is not all together free from doubt, the plaintiff who has the burden of proof, must only prove that one set of facte is more likely so than not or more likely so than the opposing set of facts. In this case the court has no difficulty in concluding that the preponderance of the evidence lies in favor of the rut theory as opposed to the U-turn theory. There is nothing whatsoever in the record to indicate any reason for making a U-turn at the particular point in question. There is nothing in the previous history of Sharon Rousseau to indicate any irresponsible conduct particularly in view of the number of people in the vehicle or anything that would indicate that she had any reason whatsoever to attempt to execute a U-turn in the face of an oncoming truck.
"The court particularly places a great weight upon the testimony of the Stones which while not entirely conclusive certainly lends strong weight to the rut theory as opposed to the U-turn theory."
Primarily, the Department argues that there was no evidence connecting the alleged highway defect to the accident.
The Department has the basic responsibility for the maintenance of State highways. LSA-R.S. 48:21, 191. It is required to maintain highways in a reasonably safe condition for motorists exercising ordinary care and reasonable prudence. Although the Department is not an insurer of the safety of motorists using State highways, it can not knowingly allow a condition to exist which is hazardous to a reasonably prudent motorist. Watson v. Morrison, 340 So.2d 588 (La.App. 1 Cir. 1976), writ denied, 341 So.2d 1134 (La.1977). The maintenance of the shoulders of highways in a reasonably safe condition is included within the duties of DOTD. Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979); Watson v. Morrison, supra; Willis v. State, Louisiana Department of Highways, 321 So.2d 819 (La.App. 1 Cir. 1975), writ denied, 325 So.2d 280 (La.1976).
The liability of the State is established. In Scott v. State, Department of Transportation and Development, 392 So.2d 482 (La. App. 1 Cir. 1980), writ denied, 396 So.2d 921 (La.1981), it was held that strict liability under LSA-C.C. art. 2317, as interpreted in Loescher v. Parr, 324 So.2d 441 (La.1975), applied to governmental agencies, such as the Department of Transportation and Development.
We find that the evidence in the instant case fully establishes that the shoulder of the highway in the vicinity of the collision was defective. On the morning after the accident, Alvin Doyle, an automotive consultant and reconstruction expert, retained as an expert by Crawford and Company for Matlack, Inc., noted a long rut in the shoulder, approximately six to seven inches deep, the center of which was located 216 feet from the gouge marks indicating the point of impact of the two vehicles. Trooper Jeffrey L. Diaz and Richard C. Stone returned to the scene the next day and noted the same deep rut. Joseph Andre, a reconstruction expert, examined the rut a few days after the collision. Andre measured approximately 200 feet of the shoulder, taking photographs at ten-foot intervals, and distinguished a "deep area" of the rut approximately 73 feet in length, and approximately six inches in depth, at its deepest point. The photographs exhibit a considerable erosion of the roadway itself in the area of the interface between the roadway and the shoulder.
The Department of Transportation and Development's maintenance manual suggests that shoulders be maintained level with the roadway surface and requires repair when the shoulder is two inches below *442 the roadway. Carl S. (Carlisle) Richard, the District Administrator of the Highway Department, quoted from the manual as follows:
"... On edge ruts, let them get at least two inches deep before routinely scheduling repair. Edge ruts that exceed five inches in depth should be treated as an emergency condition and be repaired immediately." (Emphasis added.)
The purpose of these requirements was expressed by Dwayne T. Evans, consulting traffic engineer, as follows:
"The purpose of a shoulder covers several things. One of them is to provide stability to the roadways. It's a physical thing to provide support for the road-way. Another purpose the shoulder serves is for an emergency area that a vehicle can leave the road-way safely and stop momentarily or for some length of time depending upon the emergency and not without [sic] impeding the flow of traffic on the paved surface. The shoulder, also, provides an area where a vehicle can leave the road-way whether it be intentionally or inadvertently and enter the road-way again in a safe manner. And in order to do this the road-way needs to be as flush with the ... the shoulder needs to be as flush with the paved surface as possible."
Evans expressed an opinion that the rut had been present for a considerable period of time prior to the collision. We find, as did the trial judge, that the rut rendered the roadway defective. The testimony of all experts indicates that such a rut constituted a hazardous condition to motorists using that highway. The negligence of DOTD in allowing such a hazardous condition to exist has been recognized in the cases of Sinitiere v. Lavergne, 391 So.2d 821 (La.1980), and Rue v. State, Department of Highways, supra. We agree with the trial judge's conclusion that this hazardous condition was a cause in fact of the collision.
Plaintiffs' experts espoused a road defect (rut) theory to show causation; defendant's experts espoused a U-turn theory to show that the accident was not caused by a highway defect. Both of defendant's experts agreed that these were the only two "reasonable hypotheses" as to the issue of causation.
As stated by the Court in Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, 397 (1963):
"Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation."
It is sufficient to sustain the plaintiffs' burden of proving causation if the circumstantial evidence excludes other reasonable hypotheses only with a fair amount of certainty so that it is more probable than not that the harm was caused by the tortious conduct of the defendant. Swanson v. Estate of Augusta, 403 So.2d 118 (La.App. 4 Cir. 1981).
The evidence obtained regarding the existence and extent of the roadway erosion and shoulder rut is set out above. Upon inspection of the accident scene, Joseph Andre noted gouge marks indicating the point of collision located approximately 197 feet from the end of the deep part of the rut. On the day he measured the rut, Andre travelled to a wrecker yard in Plaquemine to inspect the Pinto, and observed that the damage indicated that the automobile was at approximately a 90° angle to the truck, impacting near the hinge of the front door, and extending back eight feet towards the rear of the automobile. Andre also examined pictures of the undercarriage of the vehicle, and noted the front wheels turned in and jammed in a straight-forward position.
The right front tire of the vehicle was examined by Edwin Kurt, a tire expert, *443 Joseph Andre, and Jack Humpheries.[3] Kurt testified that the tire contained no defects which could have contributed to the accident. Humpheries and Andre stated that striations and markings on the inside wall of the tire were indicative of an attempt to climb out of the rut. Humpheries also noted that on the inside at the edge of the tire where the tread rolls around into the sidewall, there was rubber which had been moved from right to left, which is consistent with the plaintiffs' experts' reconstruction of the accident. Jack Ridenour and Lawrence Daniels, mechanical engineers, examined the Pinto for mechanical defects which could have contributed to the accident; they found no such defects.
Willie Dunn, Richard Stone, and Janice Stone provided the only "witness" evidence regarding the collision sequence. Willie Dunn testified that when he finished unloading his truck in Paincourtville at approximately 7:00 p. m. and departed for Plaquemine, a misty rain was falling. He stated that at 7:30 p. m. "as I was proceeding northbound on Highway 1, I met a string of traffic here. All of the traffic was southbound. From the string of traffic, this was one vehicle that was lingering behind. And as we proceeded closer, this vehicle got out of control. It spun directly into my truck." Dunn further noted that the Pinto approached him in a sideways position prior to the collision. Dunn did not see the station wagon slowing before the impact. Dunn immediately applied his brakes, and swerved in an attempt to avoid colliding with the Pinto. He was unable to prevent the collision. He remembers nothing after the impact.
Richard Stone testified that on the night of the accident he left Plaquemine with his wife, grandmother and three children, proceeding south on Highway 1. Before crossing the railroad tracks just south of Plaquemine, he noticed a car about one-fourth of a mile behind him. Stone was going approximately 40-50 M.P.H. He then testified:
"The point of impact was about to the best I can recall it was about a half mile, three quarters of [a] mile at the most past the railroad tracks where I had last looked in my rearview mirror. I was concentrating all my attention on the oncoming traffic which by that time I had seen a ... I could tell it was a large truck coming to meet me. As the truck got ... the front of the truck was about... well, the front of the trailer of the truck was about even with the front of our car, I heard a funny noise coming from the truck. And at that moment I didn't realize what the noise was. The truck went past me making this noise and just as the trailer had passed my door, the trailer of the truck had passed my door I heard a bang and I looked out my rear-view mirror and seen sparks flying.
* * * * * *
"Well, I remember looking in my rear-view mirror and seeing sparks flying out for about, I guess the truck must have skidded it looked like for 100 yards or so. And it went a little bit over into my lane and then went off into the ditch and into the trees. At this time I started slowing down."
Stone stated on cross-examination that the tractor-trailer rig was either right at his car door, or had just passed the door when he heard the noise. Janice Stone confirmed her husband's observations, stating that the back wheels of their car were about even with the back wheels of the truck when the accident happened.
Based upon the above physical and testimonial evidence, Joseph Andre, plaintiffs' accident reconstruction expert, concluded that the rut on the shoulder of the road was the cause in fact of the accident. The defendant's reconstruction experts, Olin K. Dart and Don Ivey, concluded that Rousseau was executing a U-turn which caused the accident when she came into the truck's lane of traffic. The trial judge carefully explained why he accepted Andre's opinion as the more probable under the circumstances of the case. We agree. We consider that, from all of the evidence, it is *444 unlikely that Rousseau was making a U-turn. We find that the accident was caused by the defective condition of the highway; the evidence in the instant case fully establishes that the shoulder of the highway at the point of the accident was defective, because a substantial drop-off from the paved portion to the shoulder existed and the shoulder was in a dangerously rutted condition. We agree with the trial judge's conclusion that this hazardous condition was the cause in fact of the accident; the rut constituted a hazard to a reasonably prudent driver.
With respect to the requirement that the Department have actual or constructive knowledge of the condition of the shoulder, the evidence establishes that the Department had employees working on the highway who had ample opportunity to observe the condition of the roadway and shoulder on frequent occasions. Earl Quatrevingt testified that DOTD required roadway and shoulder inspections on a weekly basis, and that he should have been able to observe the severe drop-off in his inspections. Evans also testified that the defect in the shoulder was not one that would develop in a short period of time, but rather one that would require weeks, or even months, to deteriorate and develop to the condition which was discovered immediately after the instant accident. When shown a picture of the crumbled asphalt on the interface between the highway and shoulder rut, Quatrevingt agreed that it would take quite some time for such a condition to develop. The pictures introduced into evidence clearly reveal a severe deterioration of the side of the roadway in addition to the development of a deep depression in the shoulder itself. Richard Stone recalled seeing the rut there several weeks before the accident.
Such circumstances are tantamount to the requisite constructive knowledge, as the courts found in Harrison v. State, Department of Highways, 375 So.2d 169 (La.App. 2 Cir. 1979), and Robertson v. Handy, 354 So.2d 626 (La.App. 1 Cir. 1977), writ denied, 356 So.2d 434 (La.1978).
On the question of contributory negligence, the trial judge stated in his Reasons:
"There is no evidence in the record to support a finding of fault or contributory negligence on the part of Sharon Rousseau.... Ms. Rousseau obviously was in a very poor position to ascertain the reason for her loss of control. It would be unreasonable to impose upon Ms. Rousseau the burden of executing a considered and safe re-entry under the circumstances presented here."
Sharon Rousseau was proceeding down a dark highway on a misty night. She apparently found herself in a deep rut composed of a defective shoulder and a crumbling asphalt highway. It appears that Rousseau may have inadvertently steered into the rut, or slipped into the rut due to the eroded asphalt. Whatever the cause of her entry into it, the Department can not argue that such entry constituted substandard conduct. See Rue v. State, Department of Highways, supra.
As stated in Rue, at page 1199:
"A motorist has the right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition."
It should be noted that the Department has made no claim of negligent re-entry by Sharon Rousseau. See Sinitiere v. Lavergne, supra. Other than its attempt to prove Sharon Rousseau was executing a U-turn, the Department has failed to offer any evidence, or develop any theory of negligence or contributory negligence on the part of the driver of the Pinto.
We have carefully reviewed the record in the case at bar and find that the findings of the trial court are amply supported by the evidence, as discussed herein. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The appellant next argues that the trial court erred in allowing Sardo and Mary Palermo recovery for the death of their grandchildren as beneficiaries of the estate of their daughter, Glinda Steib. The court made the award on the theory that *445 they were beneficiaries of the estate of Glinda Steib; ergo, they could recover on her behalf for the death of her two children. The trier concluded that there was sufficient evidence in the record to show that Glinda Steib survived her two minor children for a short period of time.
We find that there is evidence in the record, which evidence preponderates, that Glinda Steib survived her minor children. Richard Stone testified that after the accident, he went to the scene, and saw a body on the road. Then he walked over to the car and noticed a body which appeared to be the body of a 13 or 14 year old boy draped over the back of the car. He then saw two individuals inside of the car, one of whom seemed to be severely injured. Walking further towards the front of the Pinto, he noticed another body lying directly in front of the car. Upon arriving at the location of the car, he testified that he heard another individual who had arrived at the accident scene stating that the person in the passenger side of the car seemed to be alive:
"It was briefly after that the next man arrived. And he came and got on top of the hood of the car and I helped him lift the lady up out of the car. And then I carried her to the road. At the same time we noticed another woman in the car. I couldn't tell if it was a woman or not but another body between the front seat and the front door. And we also noticed another body mangled in front of the wheels of the car. * * * And some other ... someone else said that this one is still alive. Speaking of the person that was caught between the front door and the seat. And all my attention at that time was put on the woman that I was pulling out of the car." (Emphasis added.)
Trooper Diaz identified the passenger in the front seat of the vehicle as Glinda Steib. Thus, we hold, as did the trial court, that she survived her children for a short time after the accident.
Ms. Steib is a member of the first class of beneficiaries under LSA-C.C. art. 2315, and by virtue of her having survived her minor children, she had a claim for their wrongful death. This claim for wrongful death was inherited by her parents, Sardo and Mary Palermo.
Finally, DOTD argues that the trial court awarded an excessive amount of damages to these plaintiffs.
The judge, in his Reasons for Judgment, stated:
"On the question of damages the testimony of Roy Dimm indicates a very close relationship between father and sons with frequent mutual participation in recreational activities. Although the father did not have the legal custody the children practically lived with him a great deal of the time. An award of $100,000.00 to Roy Dimm for the death of his two minor children is appropriate. See Dixon v. Wiley, 325 So.2d 653 [La. App.]; Alizzi v. Employers Insurance of Wausau, 351 So.2d 258 [La.App.]. Mr. Dimm is also entitled to an award of $5,067.53 for funeral expenses.
"The testimony of Wilson and Sadie Lewis reveal a similar close relationship to Grover Lewis. Although Grover was one of several children he was a very religious child who exhibited a notable respect and affection for his parents. Thus an award of $50,000.00 to Wilson Lewis and an award of $50,000.00 to Sadie Lewis for a total of $100,000.00 would be appropriate plus the funeral expenses of $2,700.36.
"Plaintiffs Sardo and Mary Palermo claim damages for the death of their daughter, Glinda Steib. At the time of the accident Glinda Steib was legally separated from Farrell Steib. Plaintiffs argue that the term `surviving spouse' under Civil Code Article 2315 is not intended to include a legally separated spouse. The court however finds that Article 2315 is clear and controls. Therefore the claims of Sardo and Mary Palermo for the death of Glinda Steib will be dismissed.
"They also claim damages as the beneficiaries of the Estate of Glinda Steib. They urge that the claim of Glinda Steib for *446 the deaths of her only two children should be awarded to them. The court believes there is sufficient uncontradicted evidence in the record to show that Glinda Steib survived her minor children for a short period of time and in addition the weight of authority compels the application of Civil Code Article 938 thus reaching the same result. See Hoy v. Stuyvesant Insurance Company, 141 So.2d 908 [La.App.] and Doucet v. Travelers Insurance Company, 916 [91] F.Supp. 864. The court finds that an award of $100,000.00 to Glinda Steib for the deaths of her minor children would have been appropriate had she survived. The exception of no cause of action filed by the Defendant with regard to the claims of Sardo and Mary Palermo as beneficiaries to the Estate of Glinda Steib will be dismissed.
"Plaintiffs failed to produce any evidence which would indicate that any of the decedents in the accident suffered conscious pain and suffering prior to death. While the court believes that there is some evidence to demonstrate that Glinda Steib was living a short period after the accident there is no evidence to indicate that she suffered conscious pain and suffering. Thus all claims in this category will be dismissed.
"Sharon Rousseau suffered numerous serious permanent injuries as a result of this collision. She incured [sic] a generalized brain contusion, a chest injury with fractured ribs, a pneumothorax, a fractured femur, a fractured clavicle, a basilar skull fracture, and a brachial plexus stretch injury. She was hospitalized from September 15, 1978, to October 29, 1978. While her leg fracture healed without complications she will always walk with a limp and according to Dr. Messina she will suffer residual weakness in the quadruceps muscles. Her brain contusion and brachial plexus stretch injury have resulted in substantial impairment of the use of her right arm. Dr. Clifford testified that Ms. Rousseau will always have difficulty in performing general manual duties, household duties and work related duties.
"Her brain injury has also resulted in substantial personality changes including inappropriate behavior, slovenly appearance, and what is termed `a devil-may-care attitude'. Ms. Rousseau may also experience some loss of memory, loss of concentration, and a slightly increased chance of epilepsy. These brain injuries are considered to be permanent. Due to these extremely severe injuries the court is of the opinion that an award of general damages for pain, suffering, and mental anguish of $400,000.00 is appropriate. See Carollo v. Wilson, 353 So.2d 249 [La.]; Gregorie v. Hartford Accident and Indemnity Company, 348 So.2d 186 [La. App.], writ denied, 350 So.2d 1210; and Stanley v. Wiley, 325 So.2d 661 [La.App.].
"In addition due to the substantial personality changes suffered by the Plaintiff, the impairment of the use of her right arm, her various brain injuries, her limited education and work experience prior to the accident, Sharon Rousseau is totally and permanently disabled from the performance of any substantially gainful activity. At the time of the accident she was earning approximately $236.53 per month as a clerk in a bakery owned and operated by her brother. In the recent case of Folse v. Fakouri, 371 So.2d 1120 [La.] (1979), the Supreme Court stated that damages for loss of earning capacity should be based upon the injured person's ability to earn money rather than actual earnings prior to the injury. Dr. Randolph Rice, an economist, testified that assuming that Ms. Rousseau could perform the work of the lowest level secretary hired by the State of Louisiana the present value of her loss of future earnings from the date of the trial would be $308,316.00.
"Plaintiff returned to work for her brother in October of 1979. Her employer testified that due to her limited capacity to use her right arm he had to design a special job of cashier for her. He further stated that her present employment was largely in the nature of a gratuity offered to his sister because of their relationship. *447 She currently earns approximately $200.00 per month. Assuming that she is able to continue in this employment her future earnings discounted to present value would be $29,359.00 according to the calculations of Dr. Rice. It is obvious to the court that Ms. Rousseau will be unable to compete in the job market or to obtain any substantial employment other than from friends and relatives. Viewing this present employment as an attempt at mitigation of damages and allowing a credit for these earnings, the plaintiff's award for loss of future earnings should be limited to $278,956.00. In addition plaintiff was unemployed for a period of twelve months after the accident and for this period she is entitled to an award of $2,838.36 based upon her salary at the time of the accident. For the remaining fourteen months between the time of her return to work and the time of the trial she is entitled to an award of $584.48. Thus she is entitled to a total award for loss of wages prior to the trial in the amount of $3,422.84. "Medical bills introduced into evidence justify an award for medical expenses in the amount of $23,572.24. No proof was presented with regard to any future medical expenses and no allowance is made for this claim."
We turn now to a consideration of the amount of the several awards. The State argues that the trial court awarded excessive amounts of damages to these plaintiffs.
First, plaintiffs Sardo and Mary Palermo were awarded the sum of $100,000, as beneficiaries of the Estate of Glinda Steib for the deaths of Mrs. Steib's two minor children. We feel compelled to conclude that the trier of fact abused his discretion in making an excessive award in this respect. Although the evidence supports the fact that Glinda Steib was alive for a brief moment, there is no showing that she ever fully regained consciousness. Thus, to assume that Mrs. Steib was aware of the deaths of her two children would be based on sheer conjecture. Nevertheless, and however minimally, Glinda Steib did suffer the loss of her two small children. She was entitled to general damages for this loss this loss of love and affection. We feel that this loss is akin to the brief span of pain and suffering borne by the deceased in Cheatham v. City of New Orleans, 378 So.2d 369 (La.1979). The court awarded the sum of $15,000 for such loss in Cheatham. Surely one could not gainsay a like amount in the present case. We note in Wiggins v. Lane, 298 F.Supp. 194 (E.D.La.1969), the court allowed to stand a jury award of $10,000 for conscious pain and suffering before death where the deceased suffered but two seconds. In accordance with our findings, we believe that $15,000 for the loss of love and affection of each child is the highest point reasonably within the discretion of the trial court in the case at bar. Hence, pursuant to Reck v. Stevens, 373 So.2d 498 (La.1979), and Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), we reduce the award to plaintiffs Sardo and Mary Palermo, as beneficiaries of the Estate of Glinda Steib, to the sum of $15,000 for the loss of each child, or a total of $30,000.
We next consider the issue of quantum for plaintiff Roy Dimm. For the loss of love and affection of his two sons, the trial court awarded the sum of $100,000. The award is somewhat disproportionate to awards heretofore made in similar cases.
In Knotts v. State, Department of Highways, 395 So.2d 419 (La.App. 3 Cir. 1981), writs denied, 400 So.2d 669, 670 (La.1981), the court found that awards of $75,000 to each parent for the loss of "an unusually gifted, bright, intelligent and talented 11-year-old girl" were "somewhat generous but they are within the very broad discretion accorded trial court judges in fixing awards." The child was "her mother's constant companion and a combination sister, tutor, teacher, nurse and loving sibling to her 3-year-old, afflicted brother."
An award of $50,000 was made to each parent for the loss of their 21 year old son, residing with them but making no financial contribution for support, in Williams v. State Farm Mutual Automobile Insurance *448 Company, 349 So.2d 1275 (La.App. 1 Cir. 1977), writs denied, 351 So.2d 175 (La.1977). The trial judge was impressed with the "profundity of their loss"; both parents expressed "deepest love and affection" for their son.
In Lapoint v. Breaux, 395 So.2d 1377 (La. App. 1 Cir. 1981), writ denied, 399 So.2d 611 (La.1981), the court, taking into consideration that the parents of an 18 year old boy were "very fond of their child, and his loss was a great blow to them", awarded $50,000 to each parent. The son also contributed to his parents' support, for which they were granted an additional sum of $30,000.
In Walker v. St. Paul Insurance Companies, 343 So.2d 251 (La.App. 1 Cir. 1977), writ denied, 345 So.2d 61 (La.1977), the court reduced a jury award of $107,512 to $40,000 for each parent for the loss of a major child, not living with his parents or contributing to their support.
In Youngblood v. Oil Well Chemical Company of Louisiana, 352 So.2d 316 (La.App. 4 Cir. 1977), the court affirmed an award of $40,000 to the mother of an 18 year old girl, who helped at home and helped with the other children.
In Gunter v. Wiley, 325 So.2d 654 (La. App. 3 Cir. 1975), the court affirmed an award of $40,000 to each parent for each child killed in a vehicular accident (a boy, age 14; a girl, age 10). The record showed that the parents established "a community of interest, love, and affection."
In Foster v. Houston General Insurance Company, 407 So.2d 759 (La.App. 2 Cir. 1981), the court affirmed an award of $40,000 to the mother of a 17 year old mentally retarded son for loss of love and affection.
Other awards, while not used for achieving uniformity, do serve as aids in determining whether a particular award is so out of line as to be an abuse of discretion. Walker v. St. Paul Insurance Companies, supra.
We have considered the close relationship between father and sons and their frequent mutual participation in recreational activities, as well as the fact that they lived with him a good deal of the time notwithstanding the fact that he did not have legal custody of the children. Considering the guidelines for appellate review of damage awards, as enunciated in Reck v. Stevens, supra, and Coco v. Winston Industries, Inc., supra, we do not find that the trial court's awards to Mr. Dimm are so much higher than awards in other similar cases as to be an abuse of discretion.[4]
Accordingly, we affirm the award to Roy Dimm; nor do we disturb the award for funeral expenses, the sum of $5,067.53.
With regard to the award for wrongful death to Mr. and Mrs. Lewis, the trial court fixed the amount at $50,000 for each parent, with funeral expenses of $2,700.36. The record establishes a similar close relationship between Wilson and Sadie Lewis and their son, Grover. For the reasons assigned for affirming the award to Mr. Dimm, we also affirm the award to Mr. and Mrs. Lewis for the loss of love and affection of their son.
The trial court fully explained the basis for its award to Sharon Rousseau, as set out above. The record substantiates that she sustained numerous serious permanent injuries, including a brain injury which "resulted in substantial personality changes." The record also supports the award for her loss of earning capacity and loss of wages. The medical bills in evidence support the award for medical expenses to her.
Considering the principles enunciated in Reck v. Stevens, supra; Coco v. Winston Industries, Inc., supra; and McDaniel v. State, Department of Transportation and Development, 398 So.2d 88 (La.App. 3 Cir. 1981), writs denied, 404 So.2d 277, 279 (La. 1981), we do not find the award to Sharon Rousseau to be excessive. Our careful review of the record and the jurisprudence satisfies us that the award to her was fair *449 and proper. Carollo v. Wilson, 353 So.2d 249 (La.1977); Swanson v. Estate of Augusta, 403 So.2d 118 (La.App. 4 Cir. 1981).
Sardo and Mary Palermo also asserted a claim for the death of their daughter, Glinda Steib. The trial court dismissed this claim, and the Palermos answered the Department's appeal, reurging this claim.
We find that the lower court correctly denied the claim of the Palermos for the death of their daughter. At the time of the accident, the daughter was legally separated from Farrell Steib, but the marriage had not yet been terminated. She was still the wife of Farrell Steib. Clark v. Tenneco, Inc., 353 So.2d 418 (La.App. 4 Cir. 1977), writ denied, 355 So.2d 266 (La.1978), holds that surviving parents are precluded from recovery for the death of their married child where there has been no termination of the marriage by divorce. LSA-C.C. art. 2315.
Accordingly, for the reasons assigned, we modify the awards to Mr. and Mrs. Palermo and amend the judgment to reflect said reduction. In all other respects the judgment is affirmed.
Costs of this appeal are assessed against the State of Louisiana, Department of Transportation and Development in the amount of $1936.21.
AMENDED, AND AS AMENDED, AFFIRMED.
COLE, J., concurs in the result as regards liability, and concurs in all respects as regards the treatment of quantum.
NOTES
[1] At the time of the accident, Glinda Steib was married to but legally separated from Farrell Steib. Glinda Steib was the mother of Roy, Jr. and Randy Dimm. The Palermos claim damages for the death of their daughter, Glinda Steib, and they also claim that, as beneficiaries of the Estate of Glinda Steib, they are entitled to damages for the wrongful death of the minor children of Glinda Steib.
[2] Ferdinand Dimm was made a party plaintiff in the original petition. Mrs. Ferdinand Dimm, Sidney Palermo, David Palermo and Angeline Blanchard were made parties plaintiff in the second amending petition. The judgment does not allude to any of these five plaintiffs and it must be presumed that their claims were denied by the court.
[3] Also spelled "Humphries" and "Humphreys" in the record.
[4] We do not consider the insufficiency of the award as that issue was not raised by plaintiff, Roy Dimm.