492 So.2d 1225 (1986)
Lois B. SWANN, Garland Swann, Jr., and Glenda P. Swann
v.
CITY-PARISH, James C. Moore, and Fidelity and Casualty Company of New York.
No. CA 84 1034.
Court of Appeal of Louisiana, First Circuit.
April 28, 1986.
Rehearing Denied July 17, 1986.
*1226 Alexis A. St. Amant, Baton Rouge, for Lois B. Swann.
Peter T. Dazzio, Baton Rouge, for James C. Moore and Fidelity and Cas. Co. of New York.
Frank Gremillion, Asst. Parish Atty., Baton Rouge, for City of Baton Rouge-Parish of East Baton Rouge.
Before EDWARDS, SHORTESS, SAVOIE, LANIER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This suit arises out of a vehicular accident involving plaintiff Lois Swann's automobile and a utility trailer owned by defendant City of Baton Rouge-Parish of East Baton Rouge, hereafter City-Parish, and insured by Casualty Company of New York. Pior to trial, liability was conceded and the bench trial was limited to the amount of damages each of the injured persons in the car was entitled to receive.
The trial was held on October 24, 25 and December 12, 1983, and the case was taken under advisement. On April 12, 1984, the trial judge's written reasons for judgment were filed in the record. The court awarded Lois Swann $50,000 as general damages, $34,898.50 as "past loss of wages" for the period May 12, 1981, the date of the accident,[1] to August 4, 1982, the date she attained the age of 60 years, $12,933.49 as medical and drug expenses, and $257.94 as property damages. Lois Swann's daughter and grand-daughter were awarded nominal damages. Additionally, the court set the expert witness fees of ten doctors, two of whom are not medical doctors, and taxed the fees as costs and assessed all costs against "the defendant." (sic) The formal judgment, signed April 24, 1984, was devolutively appealed by Lois Swann only.

ASSIGNMENTS OF ERROR
Plaintiff-appellant assigns as error by the trial judge his findings that: (1) she was not entitled to an award of future loss of wages beyond her sixtieth birthday; (2) her physical and mental disabilities at the time of the trial were not the result of the injuries sustained in the accident; and (3) an award of $50,000 as general damages was adequate.

ISSUES
The issues presented by this appeal are whether (1) the trial judge committed manifest error in finding as a fact that Lois Swann intended to retire at age 60 and based the loss of wages award on that finding; (2) he committed manifest error in finding that her disabilities precluding employment at the time of the trial were not the result of the accident; and (3) an award of $50,000 as general damages is so low as to constitute an abuse of the trial judge's discretion.

DISABILITIES
The trial judge, in written reasons for judgment stated briefly, as follows:
Mrs. Swann contends that her most serious injury was to her head. The accident rendered her unconscious for a while and later she was incoherent and unaware of her surroundings. AN EEG *1227 indicated an irregularity in the brain waves. She was diagnosed by Dr. Guy Riche [an Internal Medicine specialist] as suffering from "possible post traumatic syndrome." Dr. Michael DeJohn [an Internal Medicine specialist] recommended her retirement for a multiplicity of reasons.
Dr. Thomas Flynn, a neurosurgeon, could find no [objective] evidence of organic [brain] problems. This examination was done on August 9, 1983. (The date of the accident was May 12, 1981.) However, he referred her to the Runnymeade Clinic for a neuropsychological examination. Mrs. Swann's tests were evaluated by Dr. Cary Rostow. Dr. Rostow was of the opinion that Mrs. Swann was suffering from a severe degree of brain impairment and that this impairment primarily results from injury to the brain. He said she could not work and that her condition is permanent.
Mrs. Swann was examined by Dr. James Poche, a neurosurgeon, who testified his examination was negative. He read the report of Dr. Rostow and said that the massive area of the brain which was found by Dr. Rostow [a clinical psychologist with a subspecialty in neuropsychology] to be impaired would cause additional occurrences, such as prolonged unconsciousness, blurred vision and slurred speech. His opinion was that Mrs. Swann was undergoing the normal aging process.
This Court finds that the symptoms Mrs. Swann is now suffering from are the result of the normal aging process. We take particular note that Dr. Rostow's evaluation comes some twenty-six plus months after the accident. The opinion of Dr. Poche carries great weight with the Court. (Bracketed material supplied.)
Dr. Poche was requested by defendant insurer's counsel to examine and evaluate plaintiff. A neurological evaluation, including the taking of Mrs. Swann's medical history, was done on May 3, 1983 and it consumed approximately 30 minutes. Dr. Rostow's initial consultation with Mrs. Swann on August 2, 1983 lasted an hour and the battery of tests, administered in September, 1983 on two other visits to Runnymeade Clinic, consumed an additional six hours. The testing was done under Dr. Rostow's supervision by Ryan Bernard, a masters prepared psychologist and, at the time the tests were administered, "a candidate for the Ph.D. in both physiological and clinical psychology at LSU."
Dr. Rostow opined that: (1) the test results "indicate that there are several general systems in the cerebral cortex responsible for certain behaviors established by research which are not functioning properly in Mrs. Swann"; (2) "she appears to have extreme difficulty in processing information centrally, ..., in making sense out of incoming and outgoing information, using it to her advantage and allowing her to adapt to demands of her environment"; (3) "her abstraction, reasoning and logical analysis seem to have some very specific deficiencies"; (4) "her sense of the external environment particularly when under pressure appears to be impaired"; and (5) she suffered from several disorders of "her functional personality." The foregoing opinions were based on Mrs. Swann's complete neuropsychological evaluation. Further, Dr. Rostow concluded that "such findings are not uncommon with individuals who have sustained central nervous system injury or impairment" and measurable impairments of the type measured in Mrs. Swann are consistent with known cases of brain damage. The "best time to conduct [a neuropsychological] evaluation" is approximately two years after the trauma to the head because "there are certain transitory phenomena associated with post concussion syndrome, ..., the immediate blow to the head" and "these transitory phenomena ought to pass before one administers a neuropsychological battery." Furthermore, he opined that the lapse of approximately two years post-trauma before the neuropsychological evaluation lends credence to the results obtained.
Dr. Rostow opined that Mrs. Swann's other health problems predating the accident, *1228 and which continued after the accident, e.g., obesity, hypertension, and venous insufficiency, had no bearing on his diagnosis and opinions because those physical problems "are essentially peripheral,..., they're outside of the central nervous system." He also opined that "the normal aging process" could not account for his findings that (1) Mrs. Swann's Brain Age Quotient (BAQ) of 82 "indicates that her functional intelligence is considerably lower than her overall intelligence which includes ... crystallized kind of learning" and that "she has lost considerable learning, the degree to which I cannot estimate because the BAQ of 82 is the bottom of the table" and "I cannot calculate below that point"; (2) the test results revealed "a brain impairment index of .83 ... [which] is considered to be clinically significant and indicative of a severe degree of cerebral impairment," i.e., "when her score is compared against scores of groups of individuals who have and who do not have brain impairment, it is extremely rare for individuals without brain impairment to have such a score and extremely common for individuals with such impairment to have such a score," (3) impairments of both the left and right hemispheres of the brain account for brain behaviors "established by research which are not functioning properly in Mrs. Swann," including her "extreme difficulty in processing information centrally, that is to say, in making sense out of incoming and outgoing information, using it to her advantage and allowing her to adapt to demands of her environment"; (4) "her abstraction, reasoning and logical analysis seem to have some very specific deficiencies" and "her sense of the external environment particularly when under pressure appears to be impaired"; (5) Mrs. Swann's brain behaviors are real, not those of a malingerer; (6) Mrs. Swann's condition is such that she "is in no position to work at this time nor is it likely that rehabilitation can be accomplished ... in the near future" and there is no known "cure for this sort of impairment"; and (7) Mrs. Swann "does not have a serious memory impairment and ... whatever memory impairment she does have is in combination with other complex tasks." Significantly, Dr. Rostow opined that Mrs. Swann "is deeply impaired" and her measurable impairments are consistent with known cases of actual brain damage.
Mrs. Swann's treating physician, Dr. Michael DeJohn, an Internal Medicine specialist, referred her to a neurosurgeon, Dr. Thomas B. Flynn, during the summer of 1983, when "the problem with [her] memory... continued." Mrs. Swann related to Dr. Flynn a history of having been rendered unconcious in a vehicular collision in May, 1981 and a "difficulty with her memory which she described as ... `terrible'" after the accident. Dr. Flynn "performed a general neurological examination ... which was uniformly normal from an objective standpoint" but, feeling that "she was totally incapacitated because of incompetent cerebration," thought "we should look further, and ... recommended a neuropsychological profile on her." He specifically referred Mrs. Swann to The Runnymeade Clinic, a facility to which he and his neurosurgery group have referred patients before because he believes the Clinic is "equipped, and by din of training, [is] capable of rendering an opinion regarding the presence or absence of organic brain dysfunction" by tests "which are quite complicated and time consuming, [and which] can pick up brain dysfunction which you cannot find on an objective neurological evaluation." Dr. Flynn stated that he, "as a neurosurgeon, [could] not find anything abnormal in [his] examination" and, rejecting the cloak of diagnostic infalliability, deferred to The Runnymeade Clinic's "group of psychologists ... [whose] specialty is neuropsychology, ... a recognized specialty and their credentials are entirely in order." Dr. Flynn testified that he had "investigated [The Runnymeade Clinic's psychologists] very carefully before [he] began referring patients a couple of years ago."
Dr. Rostow defined the term "crystallized intelligence" as "established learning" and illustrated the application of that concept by giving the example, as follows:

*1229 ... Suppose an individual ... had a high degree of intellectual attainment but on the other hand currently showed very poor and impaired learning. That represents a kind of a paradox because how could they have attained intellectual success on the one hand when currently they're operating at an impaired level. The answer is that established learning, sometimes called crystallized intelligence, is affected by brain injury only when the injury is extremely severe. But these other functions, such as the ability to learn currently, short term memory and the like can be affected by lesser forms of brain injury. When we made such a comparison, we received a [BAQ] score of 82, which indicates that [Mrs. Swann's] functional intelligence is considerably lower than her overall intelligence which includes this crystallized kind of learning. (Emphasis and brackets supplied.)
Mrs. Swann, a Registered Nurse, had worked at East Louisiana State Hospital, hereafter ELSH, located at Jackson, Louisiana, from 1967 until the May, 1981 vehicular accident. Her job title was "Registered Nurse IV". As such she had supervisory responsibility and direct patient care for patients on four wards, including the Acute Admission Ward of the Clinic, working the night shift. At the time of the accident she had accumulated "close to ten months" of sick leave and annual leave. She testified that at the time of the accident her health was good, she walked much in performing her duties but her legs were good and she missed no work because of "venous insufficiency" after she underwent a surgical procedure in 1968 to alleviate a problem with varicose veins.
The district judge, in his reasons for judgment, emphasized that "Dr. Rostow's evaluation comes some 26 months plus after the accident," followed immediately by the statement that "the opinion of Dr. Poche carries great weight with the Court." Dr. Poche's neurosurgical evaluation, done at the behest of defendant insurer, was done more than 23 months post accident, a fact not alluded to in reasons for judgment. Over plaintiff's objection, Dr. Poche was permitted to critique the behavioral findings of Dr. Rostow, a neuropsychologist. Dr. Poche testified that he "found no evidence" to support Dr. Rostow's conclusions, expressed skepticism about Dr. Rostow's findings as "a true evaluation," and, surmised that "if we accept these [Runnymeade] tests as accurate perhaps what ... [the tests show] ... is... just the normal aging process ..., perhaps some acceleration of that process." (Emphasis supplied.) Further, Dr. Poche stated that "on occasion" he has referred patients to a neuro-psychologist, not including The Runnymeade Clinic; and testing by neuro-psychologists to detect brain dysfunction "can suggest that [but] it's not an objective determination." Dr. Flynn, contrariwise, testified that the neuro-psychological tests done at The Runnymeade Clinic "can pick up brain dysfunction which you cannot find on an objective neurological examination." Runnymeade's "testing goes well beyond the subjective" and he "would very much hesitate to comment on the nature of their [Runnymeade's] test[ing] because I'm not an expert in that." Dr. Flynn saw Mrs. Swann in his office both before and after her initial visit with Dr. Rostow at The Runnymeade Clinic. Dr. Poche saw Mrs. Swann for approximately one-half hour on one visit only.
In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133, this Court, per Lanier, J., cogently stated that:
... The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based.... The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978); ...
422 So.2d at 1204. (Emphasis and elipsis supplied.)
*1230 In Johnson v. R.P. Farnsworth and Company, 186 So.2d 405 (La.App. 1st Cir. 1966), we reiterated as follows:
It is now settled jurisprudence that in evaluating the testimony of medical experts of equal or nearly equal qualifications, considerable weight and importance must be attached to the relative opportunities for observation of the patient and familiarity with the patient and his history.
186 So.2d at 409.
We recently applied the above principle in Hayes v. Commercial Union Assurance Co., 459 So.2d 1245 (La.App. 1st Cir.1984) and approved the district court's apparent reliance on the medical opinion of the primary treating physician, a Family Medicine specialist, although an orthopedist who had seen the patient eight times in his office expressed a different opinion about the nature and extent of the patient's orthopedic injuries.
Plaintiff cites Alexander v. Leger, 423 So.2d 731 (La.App. 3d Cir.1982) as authority for the proposition that positive findings of medical experts are to be afforded greater weight than negative findings as to the existence or non-existence of a particular condition. Plaintiff argues that both neurosurgeons, Dr. Poche and Dr. Flynn, were qualified to testify only that each was not able to find any objective evidence to corroborate Mrs. Swann's contention that she had brain dysfunctions caused by trauma.
We have reviewed the entire record, including the trial judge's written reasons for judgment, and conclude that his factual finding that "the symptoms Mrs. Swann is now suffering from are the result of the normal aging process" is clearly or manifestly erroneous.
The trial judge has considerable discretion in accepting or rejecting expert testimony and the weight which he gives to expert testimony is determined by the qualifications, the field experience, and the facts upon which the expert's opinion is based. Harris v. Best of America, Inc., 466 So.2d 1309 (La.App. 1st Cir.1985). The acceptance of Dr. Poche's negative findings and skepticism regarding the validity of neuro-psychological testing, by The Runnymeade Clinic or any other individual or group of neuro-psychologists, was clearly wrong. Dr. Poche's belief that only medical doctors can detect brain dysfunctions by medical diagnostic procedures, a belief not shared by Thomas B. Flynn, M.D., also a neurosurgeon, was the basis for the trial judge's conclusion that Mrs. Swann's mental state was the result of the normal aging process rather than the trauma received in the accident. That conclusion is not supported by the record as a whole. It must be remembered that Mrs. Swann was almost 59 years old when the accident occurred and she had worked for almost 15 years in the responsible position of registered nurse for the same employer and had accumulated almost ten months of annual leave and sick leave, even taking into account she had used several months of sick leave as a result of a job-related injury sustained in 1977 and approximately one month as a result of injuries sustained in a slip and fall accident in a supermarket in 1973. The varicose vein problem was resolved by surgery in 1968 and Mrs. Swann neither lost any work nor was hospitalized for phlebitis at any time between 1968 and 1981. Her weight of approximately 200 pounds and her venous insufficiency never required her to quit working. However, after the automobile-trailer accident and the hospitalization immediately following the accident, Mrs. Swann became unable, both from a physical and mental standpoint, to perform the duties of a registered nurse or any other meaningful employment. She was physically and mentally well before the accident and was neither after the accident.
We find that Mrs. Swann proved the causal connection between the accident and her physical disabilities and brain dysfunction by the required preponderance of the evidence. This disposes of the second assignment of error.

LOSS OF FUTURE EARNINGS
We now address the retirement issue. Although she had talked about retirement *1231 before the accident because of her age, Mrs. Swann testified that she "wanted to work to at least age seventy," because she lived alone, was divorced, and was looking forward to having more income so she could enjoy her retirement. An insurance adjuster who investigated Mrs. Swann's claim, Robert Fernandez, testified as an impeachment witness that Mrs. Swann's son, Garland, after the accident, in a conversation with him, "mentioned that his mother had to have fifteen years, at least fifteen years service with the State of Louisiana before retirement; she was looking forward to retirement; she only had a few more years before she was eligible." However, on cross-examination, Mr. Fernandez admitted that Garland Swann did not tell him that Mrs. Swann intended to retire after she attained 15 years of creditable service in the State Employees Retirement System.
The district judge, in his reasons for judgment, stated, in pertinent part, as follows:
We also find that Mrs. Swann had a significant medical history and that this contributed to her having to retire. It was also established as a fact that she intended to retire at age 60 (she was over 59 years of age at the time of the accident).[2] ...
. . . . .
Because we have found that Mrs. Swann intended to retire at age 60, we must deny her claim for future loss of wages. If she is unable to work now, it is because of her prior medical problems.
The district court committed manifest error in finding that Mrs. Swann "intended to retire at age 60" and that any inability to work at the time of trial "was because of her prior medical problems." The record as a whole does not support either finding. On the contrary, the record establishes that, although Mrs. Swann could have retired with a reduced benefit even before the accident, she, as a divorced woman living alone, desired to work as long as possible, even to age 70 or beyond, in order to assure the income she would receive as retirement benefits would be adequate for her needs.
Mrs. Swann cites Huval v. Sinitiere, 376 So.2d 548 (La.App. 3d Cir.1979), as authority for the proposition that even though a person admits he had intended to retire about one year after the accident causing disabling injuries, such statement of intention is no legal barrier to an award of future loss of wages for at least the person's work-life expectancy. The court, in Huval, supra, adopted the trial judge's opinion as its own, which states, in pertinent part, as follows:
The Court must now consider what effect Plaintiff's declared intent to retire prior to his injury has upon his future loss of earnings.... Plaintiff testified during the trial that having experienced many months away from his routine of employment that he found non-employment boring and indicated to the Court that were it not for his permanent disabling injuries that he would be working again. The Court finds Plaintiff's testimony to be credible and must conclude that but for his forced retirement due to disability that Plaintiff would have worked for at least his work-life expectancy. Furthermore, the Court does not equate the Plaintiff's pre-injury statement of his intent to retire from his current employment as a declaration of intent not to engage in any gainful employment even though he had elected to retire.
376 So.2d at 551.
The District Court awarded Mrs. Swann wages lost from the accident date until August 4, 1982, in the amount of $34,898.50. On August 4, 1982, Mrs. Swann attained age 60 and that was the basis for cutting off the loss of wages because the court had found as a fact she intended to retire when she became 60 years old.
*1232 Mrs. Swann's base pay, plus shift differential, increased to $2,435.00 per month on September 1, 1981.
Jan Duggar, Ph.D., an economist in private practice, testified that as of the date of the accident Mrs. Swann had a normal work life expectancy for all females of 5.9 years and a life expectancy of 22.9 years; at that time she was 58.75 years old. If Mrs. Swann had been able to work until age 70 she would have 8.9 years from the date of Dr. Duggar's testimony on October 25, 1983.
Dr. Duggar pointedly observed that the work-life expectancy he testified about "is an average for all women of that group"; in determining the actual work life, as opposed to work-life expectancy, statistics show there is "a substantial difference" between women who are heads of households and women in a household where there is a male head of house; women who are divorced, widowed, or single "tend to stay in the work force much longer than those that are in a household where there is a male head of house." For those reasons, Dr. Duggar made two calculations of loss of future wages. His first calculation was based on the assumption plaintiff would work to age 70 and his second, or alternative, calculation was based on the assumption that plaintiff "worked or would have worked the average work life expectancy."
By working to age 70 Mrs. Swann's annual retirement benefits would have amounted to $19,178.00 as opposed to the $9,024.00 per year she was receiving as disability retirement benefits based on her having retired in March 1982. Dr. Duggar calculated the loss of wages from the accident date, to October 24, 1983, to be $71,048.00, plus 15% of that figure as the value of fringe benefits, or a total past loss of wages and fringe benefits of $81,705.00. Using the remaining work-life expectancy of 3.5 years, dating from October 24, 1983, Mrs. Swann's loss of future earnings was calculated to be $112,429.00 and using the 8.9 years Mrs. Swann would have to work if she worked until she attained the age of 70 years, the loss of future earnings was calculated to be $271,464.00. Dr. Duggar testified that in his projections of future earnings he used a 6% average increase in pay and discounted the mass 8% which he characterized as "reasonable" and "conservative" percentages. Defendant did not call as a witness their own economist.
Dr. Duggar testified that Mrs. Swann's remuneration from September 1, 1981, to the date of the trial, on an annualized basis was $29,220.00, excluding fringe benefits such as group hospitalization insurance, life insurance and enhanced retirement benefits.
We hold that the past loss of wages Mrs. Swann is entitled to receive for the period ending October 24, 1983 is the sum of $81,705.00. We also hold that Mrs. Swann is entitled to loss of future wages in the amount of $112,429.00, representing lost wages and fringe benefits from October 25, 1983, for the duration of her "work life expectancy," stated by Dr. Duggar to be "at this point in time [October 25, 1983] only three and a half additional years, if we use the work life expectancy for all females." The record, taken as a whole, supports our holding that Mrs. Swann would have worked the remainder of her work-life expectancy and Dr. Duggar's calculations were not successfully attacked. The record does not support Mrs. Swann's claim that she is entitled to future loss of wages until she attains the mandatory retirement age of 70 years. (Brackets supplied.)
Mrs. Swann's application for disability retirement was approved by the State Employees' Retirement System on March 10, 1982. She had exhausted accumulated sick and annual leave approximately three months before her disability retirement took effect. The defendants are not entitled to diminution of the award we make for future lost wages, or any other part of the award because retirement benefits Mrs. Swann receives come "from a source to which defendants did not contribute." We hold that Mrs. Swann is entitled to loss of future earnings because of forced retirement *1233 and the collateral source rule is applicable. Reeves v. Gulf States Utilities Co., 327 So.2d 671, 675-676 (La.App. 1st Cir. 1975); writs refused, 330 So.2d 309 (La. 1976) and 330 So.2d 311 (La.1976).

GENERAL DAMAGES
Without articulating any reasons therefor, the trial judge awarded Mrs. Swann general damages of $50,000.00. Defendants argue in their brief that "a general damage award of $30,000.00 is more than reasonable under the circumstances of the case." Mrs. Swann assigns as error the trial judge's limiting the general damages award to $50,000.00, arguing that the award is so inadequate as to constitute an abuse of the trier of fact's "much discretion" under La.C.C. art. 1934(3) in fixing damages.
Distinguishing the case law cited in defendants' brief requires no effort for the simple reason that defendants cite none, either for the proposition that the $50,000.00 general damages award was excessive, or for any other proposition advanced by defendants. Mrs. Swann cites Stanley v. Wiley, 325 So.2d 661 (La.App. 3d Cir. 1975) as a reference point for increasing the general damages.
In Reck v. Stevens, 373 So.2d 498 (La. 1979), the Supreme Court, per Tate, J., reiterated the well-established codal rule that in the assessment of general damages, "much discretion must be left to the [trial] judge or jury," citing Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) as "the fountainhead decision of modern jurisprudence interpreting and applying this [article 1934(3)] code provision." 373 So.2d at 499. Observing that the Supreme Court had "elaborated on the methodology of appellate review of awards for general damages in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977)," Justice Tate quoted from Coco, 341 So.2d at 335-36, as follows:
We do re-emphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
373 So.2d at 500. (Emphasis by the Court.)
Justice Tate reasoned further, in part, as follows in Reck:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive [or inadequate].
. . . . .
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's "much discretion," ... in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive,..., or insufficient,.... Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
...... [P]rior awards may serve as an aid in this determination [of excessiveness or insufficiency] only where, on an articulated basis, the present award is shown to be greatly disproportionate to *1234 past awards (not selected past awards, but the mass of them) for (truly) "similar" injuries, see Coco at 341 So.2d 334.
However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979).
373 So.2d at 501. (Emphasis and brackets supplied.)
Mrs. Swann, a registered nurse, had been in the employ of the same employer from January, 1967 until the May, 1981 auto-trailer collision. She occupied a responsible position, including supervisory duties, rendering direct patient care, and supervising others who rendered direct patient care, to patients at one of the State's mental hospitals. She enjoyed her job and received regular promotions and salary increases as her longevity on the job and responsibilities increased. She never returned to work after the accident; however, she utilized the accumulated sick leave and annual leave, almost ten months worth, until it was exhausted and then she was granted disability retirement benefits in March, 1982, a few months before she attained the age of 60 years on August 4, 1982. She lacked the requisite ability to interpret physicians' orders after the accident which rendered her unconscious. Her mental impairment or brain dysfunction, including faulty memory and the inability to process information, was such that she could no longer function as a nurse. She developed a proneness to phlebitis which manifested itself within a few weeks after she was hospitalized for six broken ribs, broken clavicle, and concussion. The fractured clavicle produced some disfigurement which cannot be corrected. In addition, she developed a pulmonary embolus while in the hospital, a condition which threatened her life until it was resolved. Mrs. Swann's self-image was badly damaged, if not devastated, by the impairment of her mental functions of which she was aware and helpless to correct or minimize. Neuro-psychological rehabilitation for Mrs. Swann is, at best, a dim hope. Social relationships will be more difficult for Mrs. Swann to initiate and maintain because of her brain dysfunction, one result of which has been to lessen the control she has over her emotions. In brief, her working days are over and she is embarrassed and humiliated by her inability to do the job which her education and experience formerly qualified her to do.
In Jacobs v. New Orleans Parish Service, Inc., 422 So.2d 207 (La.App. 4th Cir. 1982), the Fourth Circuit Court of Appeal affirmed an award of $100,000.00 to a mature lady, a public school teacher, for psychological disability which rendered her "incapable of functioning, much less working, as a teacher." 422 So.2d at 208. The Supreme Court, per Dennis, J., affirmed. 432 So.2d 843 (La.1983).
This Court, in Palermo v. Allstate Insurance Co., 415 So.2d 437 (La.App. 1st Cir.1982), affirmed a general damages award of $400,000.00 made to a young woman, whose age is not stated, who, as a result of brain injury sustained in the accident forming the basis of the suit, underwent "substantial personality changes, including inappropriate behavior, slovenly appearance, and what is termed `a devil-may-care attitude,'" and "may also experience some loss of memory, loss of concentration, and a slightly increased chance of epilepsy." 415 So.2d at 446. Other injuries sustained by the accident victim were fractures of the femur, clavicle, several ribs, skull, a stretch injury of the brachial plexus and a pneumothorax (collapsed lung) resulting from the chest injury and broken ribs. We held, as did the trial court in Palermo, that "it is obvious to the court that Ms. Rousseau will be unable to compete in the job market or to obtain any substantial employment other than from friends and relatives." 415 So.2d at 447.
In Smith v. State, Through Dept. of Transp., Etc., 412 So.2d 685 (La.App. 2d Cir.1972), writ denied, 413 So.2d 907 (1982), the Second Circuit Court of Appeal affirmed a general damages award of *1235 $600,000.00 made to a minor for his "pain, suffering and permanent physical disability" resulting from "contusions and damage to the brain and brain stem, a basal skull fracture, a fractured femur, clonus, spasticity, aspiration pneumonia and rigidity of his body." 412 So.2d at 691. In finding the award not excessive, the court, in addition to stating the injuries enumerated above, reasoned, in part, as follows:
By far the most unfortunate aspect of this tragic case is the effect the brain injuries have had on young Kevin. He has been left with an I.Q. of 69 which is insufficient to allow him to complete even a high school education. Further, the injuries have produced a severe personality change.
412 So.2d at 691.
In Bunkie Funeral Home, Inc. v. McNutt, 414 So.2d 1263 (La.App. 3d Cir. 1982), the Third Circuit Court of Appeal reduced a general damages award of $140,000.00 to $80,000.00. The accident victim, coincidentally a registered nurse, sustained fractures of the scapula (shoulder blade), clavicle (collar bone) and a small avulsion fracture of the fourth lumbar vertebra. She was hospitalized three weeks and was discharged with her right arm in a sling; the avulsion fracture of the vertebra required no treatment except bed rest. In reducing the award to $80,000.00, the Court of Appeal held that "there is absolutely no medical testimony to support the existence of these residuals" and the testimony of the doctors, including the 49 year old victim's treating physician, was that they could find no justification for her continued complaints. The court held that "the highest award which can be justified under the evidence is $80,000.00." 414 So.2d at 1271-1272.
In Stanley v. Wiley, 325 So.2d 661 (La. App. 3d Cir.1976), cited by Mrs. Swann, the Court of Appeal affirmed a general damages award of $275,000.00 made to a 13 year old child who sustained head injuries and a broken pelvis. The child was comatose for over six weeks after the accident. Following her recovery, which ceased at the end of one year post-accident, the child had no memory of the accident, experienced bed wetting, was fearful of being or sleeping alone or riding in an automobile. Based on tests by a psychologist and a psychiatrist, the child was determined to have permanent brain damage resulting in mental retardation or intellectual impairment, inappropriate behavior, emotional management problems, loss of spontaniety and vitality, impaired judgment, and "faces obstructions in her social life and vocational prospects." 325 So.2d at 662.
We hold that the trial judge did not abuse his "much discretion" in awarding Mrs. Swann only $50,000.00 as general damages for the fractured ribs, fractured clavicle, and increased proneness to phlebitis episodes. We reach this conclusion based on a careful analysis of the record as a whole.
As stated by the Supreme Court in Carollo v. Wilson, 353 So.2d 249 (La.1977):
The courts of appeal have a constitutional duty to review the law and facts and thereafter render a judgment on quantum based on the merits, determining whether the jury has abused its "much discretion" that the law accords it in awarding damages.... In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering it to the highest point which is reasonably within the discretion afforded the trier of fact....
353 So.2d at 252.
Likewise, an inadequate award may be disturbed by increasing it to the lowest point which is reasonably within the discretion afforded the trier of fact. Coco, supra.
The lowest award which was reasonably within the discretion of the trier of fact in this case, the trial judge, for Mrs. Swann's brain dysfunction/mental impairment/psychological disability, either term or all terms being applicable under the facts of this case, is the sum of $100,000.00.

DECREE
For the reasons assigned, the judgment of the district court is amended by (1) increasing *1236 the past loss of wages award from $34,898.50 to $81,705.00, (2) awarding future lost wages and fringe benefits in the amount of $112,429.00, (3) awarding general damages of $100,000.00 for brain dysfunction/mental impairment/psychological disability. The judgment is affirmed insofar as it awards $50,000.00 in general damages for the fractured ribs, fractured clavicle and increased proneness to phlebitis episodes, $12,933.49 in medical and drug expenses, $257.94 for property damage, taxes expert witnesses fees as costs of court, and assesses all costs of court against defendants. All sums awarded by the district court and those made by this court are to bear legal interest from date of judicial demand until paid. Court costs in the amount of $3,613.91 are taxed against defendants, City and Parish of East Baton Rouge, James C. Moore and Casualty Company of New York. La.R.S. 13:5112(A).
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Although the trial judge stated the accident happened on May 12, 1981, the record discloses it happened on May 21, 1981.
[2] The record reflects Mrs. Swann was born August 4, 1922, thus she was under 59 rather than over 59 at the time of the accident.