535 So.2d 903 (1988)
Othello ALLEN, Plaintiff-Appellee, Appellant,
v.
STATE of Louisiana, et al., Defendant-Appellant, Appellee.
No. 19892-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1988.
Writ Denied December 2, 1988.
*905 Booth, Lockard, Politz, LeSage & D'Anna, by John R. D'Anna, Shreveport, for appellant.
Robert E. Piper, Jr., Donald R. Miller, Shreveport, for appellee.
Before MARVIN, JASPER E. JONES and NORRIS, JJ.
MARVIN, Judge.
In this medical malpractice action, the State and the LSU Medical Center in Shreveport appeal a judgment awarding damages that total more than $435,000 to a wood cutter whose left leg became infected and gangrenous and had to be amputated after he fell in the woods about a week before.
Plaintiff also appealed, seeking to increase the awards for general damages ($225,000) and loss of earnings ($268,437.09, which the trial court reduced by $103,534 plaintiff would receive as social security disability benefits).
We affirm the general damage award. We amend to delete awards for future raises in salary and for lost homemaking services ($45,926 total) that we find are factually unfounded. We disallow the reduction for social security benefits and further increase the award for loss of earnings to $275,000 to have the amended judgment total $500,000, the maximum allowable award for medical malpractice damages against the State under LRS 40:1299.39. As amended, the judgment is affirmed.
The State contends that its doctor, a first-year internal medicine resident at the medical center, should not have been found negligent for his failure to diagnose plaintiff's infection when he first examined and released plaintiff two days before the condition became obvious. Expert opinion, of course, conflicted.
The State's doctor was found negligent essentially because he failed to determine that the severe muscle spasm in plaintiff's leg, which he treated and was concerned with, was caused, not by plaintiff's fall a week before, but by pain from the gangrenous infection.
Our review of conflicting testimony, in the light that most favorably supports the judgment, convinces us that the trial court's conclusions are not clearly wrong and are supported by a preponderance of the evidence.

FACTS
On October 19, 1982, the 37-year-old plaintiff, Othello Allen, fell about 3½ feet from a log or stump into pine tree limbs and other brush that had been piled on the ground. He fell on his left side, experienced back pain, and had no visible abrasions, contusions, or lacerations. He was not able to work on October 20.
On October 21, he complained to his hometown doctor in Mansfield, Dr. Bucy, of a "catch" in his back and pain in his hips and buttocks. Allen did not complain of leg pain. Dr. Bucy noticed no visible signs of injury on his body or significant abnormalities in Allen's back or leg. Dr. Bucy examined Allen's rectum to rule out an abscess as the cause of his pain. He noticed no swelling or discoloration of Allen's left leg. Dr. Bucy prescribed a muscle relaxant, Soma Compound, and did not hospitalize him.
After seeing Dr. Bucy on October 21, Allen began to experience pain in his left leg which became progressively worse. On October 24, for financial reasons, Allen's wife took him to the LSU Medical Center in Shreveport, where they were directed to the walk-in clinic for ambulatory care about 6:30 p.m. About 1½ hours later, a nurse recorded Allen's temperature (98°) and blood pressure (90/50). She wrote that he complained of a "catch on left hip to thigh area" and that he was not in acute distress.
Dr. Tynes, the State's first-year internal medicine resident, saw Allen around 3:30 a.m. on October 25. The hospital records also note this history:

*906 37-year-old black male was in normal state of health until 4-5 days ago when he went to his usual job as a pulpwood cutter and returned with low back pain. This eventually settled in the left thigh; muscles have been pulled for 2 days. Saw a local M.D. who prescribed Soma, no relief.
Dr. Tynes also examined Allen's rectum and ruled out an abscess. He found severe muscle spasm in the quadricep and hamstring muscles of Allen's left thigh, which he deduced was post-traumatic reflex muscle spasm, caused either by direct blunt trauma or by pulling or straining the muscles.
Dr. Tynes did not determine or inquire how Allen's injury occurred, whether it was a fall or a blunt trauma such as being hit with a log. He found the severity of the muscle spasm noteworthy in light of the apparently mild trauma and the absence of any visible cuts, bruises or other wounds to the skin.
Dr. Tynes said seven hours was not an unusually long wait in the walk-in clinic and that he probably would have noticed any temperature increase during his physical examination. He said he always checks the patient's heart rate and would have noticed, and charted, any accelerated heart or respiratory rate. Dr. Tynes explained that he usually does not chart expected or normal findings.
Dr. Tynes said he "eyeballed," but did not measure, the circumference of Allen's left and right legs on October 25. He said that he had to touch the left leg to examine the muscle spasm and that he would have noticed the presence of any elevated local temperature or bubbles under the skin and would have charted any abnormal findings.
Dr. Tynes explained that he did not take X rays on October 25 because he found nothing to suggest Allen had a broken bone. Dr. Tynes further explained that he knew muscle spasm could result from the leg's reaction to pain caused by an infection, but did not suspect an infection because he found no cuts, bruises, skin lesions, pus, swelling, or discoloration of Allen's left leg.
Dr. Tynes informally consulted about the condition of Allen's leg, however, with another first-year resident (in urology) who had had some surgical experience. Both doctors examined Allen's leg and agreed Allen should be given Valium "to see if we could quell some of the muscle spasms that might be hiding some underlying pathology we didn't know about, and also to try to reduce some of the discomfort." Dr. Tynes injected the Valium intravenously. This injection did not produce expected results, but only slightly improved the spasms and Allen's range of motion.
Dr. Tynes prescribed Flexeril, a muscle relaxant stronger than Soma, as well as pain medication and warm soaks. He did not chart, but felt sure he gave, verbal instructions for Allen to call or come back if any new problems developed. Dr. Tynes did not recall Allen being disoriented and said he would have investigated this if he had noticed it. The urology resident generally corroborated Dr. Tynes.
Allen said he was so sick when he was taken to LSUMC that he didn't remember anything except leaving home to go there on October 24. His wife and her brother-in-law said Allen, on October 24-25, was incoherent, couldn't walk, was feverish, sweating a lot, and his leg was visibly swollen and red.

DEVELOPMENTS AFTER OCTOBER 25
Allen remembered nothing that happened between going home on October 25 and his return to LSUMC on October 27. His wife said she gave him the medicine and the sitz baths prescribed by Dr. Tynes on October 25, but that Allen's fever, leg pain, and swelling progressively increased. She returned him to the LSUMC emergency room about 6:00 p.m. on October 27, disoriented, unresponsive, and severely ill. The hospital records give this account of his condition:
37-year-old black male complained of swollen leg five days. Came to doctor first day, given muscle relaxer and analgesics. Was OK until this a.m. when he became disorientedleg was swollen *907 wife brought him here with fever. (Our emphasis.)
Mrs. Allen testified she was the only person who spoke to the doctors on Allen's behalf on October 27 and said she did not tell anyone that her husband "was OK" until that morning.
On October 27, the hospital recorded Allen's temperature as 103.3° and his blood pressure as 110/70 and noted an accelerated heart rate. His left leg was tender to the touch and markedly swollen, with the left thigh measuring nine centimeters more in circumference than the right and the left calf measuring three centimeters more than the right. Allen could not respond to questions.
The emergency room resident thought Allen needed surgery and consulted the chief resident in surgery, who in turn called in Dr. Deitch, a general surgeon and faculty member. Dr. Deitch reported to the hospital within 15 minutes, finding Allen unresponsive and severely ill with a swollen left leg.
X rays showed gas in the tissue of the leg, indicating an aggressive soft tissue infection that could be caused by various types of bacteria. Antibiotics were administered to try to halt the spread of the bacteria. Dr. Deitch opened the leg as soon as Allen's vital signs were relatively stabilized, finding dead muscle tissue and rampant infection throughout the leg. Because of the widespread infection, the leg had to be amputated about six inches below the hip joint to save Allen's life. Allen was hospitalized for about six weeks and had at least four other surgeries to debride damaged muscle in his leg and irrigate the wound.
Several weeks after the amputation, skin was grafted from his right thigh to close the wound. About once every two months pus accumulates and forms "knots" which break or must be surgically opened to allow drainage. Each drainage episode and resulting discomfort takes about a month to subside. Allen cannot wear a prosthesis because the stump is not long enough to accommodate and allow hip control for an artificial limb. He "walks" only with crutches.

STANDARD OF CARE
Dr. Tynes was a general physician, not a specialist, in 1982. His obligation was to exercise the degree of skill ordinarily employed by physicians practicing in similar localities and under similar circumstances, and to use reasonable care along with his best judgment in exercising that skill. If he failed in either respect, and if his substandard care caused injuries which plaintiff would not have otherwise suffered, he is deemed negligent and his employer is vicariously liable for his breach of this professional duty. LRS 9:2794; Bryant v. St. Paul Fire and Marine Ins. Co., 382 So.2d 234 (La.App. 3d Cir.1980); Matthews v. La. State Univ. Medical Center, 467 So.2d 1238 (La.App. 2d Cir.1985).
We recognize that a medical diagnosis is an act of professional judgment which cannot be made with absolute precision and which should not be evaluated solely by hindsight. Courts determine whether a doctor's conduct is reasonable under the circumstances with which the doctor is faced when his or her professional judgment is exercised. See and compare Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988).

EXPERT TESTIMONY
The bacteria that caused the infection was never specifically identified, but it was agreed that the bacteria was one of several which cause a gangrenous infection. These bacteria are found everywhere in the soil and may enter the body through any break in the skin, however slight. Most of the culprit bacteria are capable of forming spores in the presence of oxygen but require an environment without oxygen before they can multiply aggressively. Aggressive growth is usually thwarted by the oxygen and white blood cells in the blood.
If the bacteria escape the body's oxygen and defense mechanisms, as when tissue has been weakened by trauma or contaminated with dirt, the bacteria incubate and then begin to aggressively multiply and *908 produce toxins which cause sudden severe pain followed by swelling, discoloration and increased temperature in the affected area. Body temperature as a whole may or may not rise at first. Spasm, or muscle rigidity, is not caused directly by the infection, but is the body's reaction to pain that the infection causes.
Gas produced by the bacteria facilitate the spread of the infection through body tissue. Gas bubbles can be felt through the skin and seen on X rays. Other symptoms include accelerated heart and pulse rates, increased white blood count, and disorientation.
Infected tissue cannot be restored with antibiotics and must be surgically removed. Antibiotics do not revive the dead tissue, but help to limit the contamination of other tissue. A gangrenous infection is fatal without prompt medical and surgical intervention.
Testimony conflicted as to the time for the infection to become apparent after the bacteria enter the body. Allen's expert, Dr. Toth, a general physician with some emergency room experience, agreed with the medical literature to the effect that the incubation period can range from three hours to six weeks and is usually three or four days. Dr. Toth said rapid onset is more likely if there is a lot of dead tissue, as with a large and dirty wound, or if the patient is elderly, atherosclerotic or diabetic. Because these conditions were not present, Dr. Toth opined that the infection had gradual onset after Allen's work injury on October 19.
The State's experts, Dr. Eddy and Dr. Deitch, both surgeons, were not aware of any gas gangrene cases where incubation periods were longer than a few days. Dr. Eddy estimated the incubation period to range from a few hours to not more than 48 hours. Dr. Eddy said once the infection is diagnosable, the patient will live for only 24-48 hours without treatment.
Dr. Deitch thought pain would begin within 12-24 hours after injury, followed by swelling within a few hours or a day, and by death within three days of the injury. Dr. Deitch agreed that variables such as the number of bacteria in the innoculant, the type of bacteria, the extent of the oxygen-free environment, and the host's immunological status would lengthen or shorten the incubation period. He said even with an extended incubation period, death occurs within hours or not more than two days after the onset of pain.
Drs. Tynes, Eddy, and Deitch opined that Allen would not have lived until October 27 if he had had a clinically diagnosable gas gangrene infection at 3:30 a.m. on October 25. They speculated that Allen may have sustained an injury which introduced the bacteria between October 25 and October 27. Allen's wife denied that Allen had any such injury and explained his bedridden condition during the interval.
Expert opinions were based on the assumption that Allen's condition on the October 24 visit to the emergency room was as the hospital records described: No fever, 90/50 blood pressure, no acute distress, no readily visible breaks in the skin, no noticeable swelling of the left leg, and severe spasm in both muscle groups in the left thigh.
37-year-old black male was in normal state of health until 4-5 days ago when he went to his usual job as a pulpwood cutter and returned with low back pain. This eventually settled in the left thigh; muscles have been pulled for 2 days. Saw a local M.D. who prescribed Soma, no relief.
Dr. Toth explained that a gas gangrene infection may or may not cause fever initially but will cause the patient's pulse to rise to a rate that is out of proportion to what is expected where there is little or no fever. Dr. Toth considered the hospital records to be "deficient" because the nurse who took Allen's temperature and blood pressure did not record the other two vital signspulse and respiration rates. Dr. Toth thought Dr. Tynes fell below the standard of care by not taking Allen's vital signs when he saw him at 3:30 a.m. October 25, over seven hours after the nurse recorded some signs.
*909 Dr. Eddy found nothing substandard about Dr. Tynes's failure to chart the expected findings. He believed that Dr. Tynes checked, but did not record, Allen's pulse and respiration rates.
Dr. Toth felt Allen's blood pressure was suspiciously low on October 24 because high blood pressure is common among black males. He said low blood pressure would indicate sepsis, or blood-borne infection, and would have required any reasonable physician to order a blood test to rule out sepsis.
Drs. Tynes, Eddy, and Deitch did not agree that Allen's blood pressure was indicative of sepsis and considered it "low normal" for someone who was a heavy manual laborer in good physical shape. Drs. Eddy and Deitch opined that Dr. Tynes's decision not to X ray was proper. Dr. Toth thought Dr. Tynes should have taken X rays because he knew Allen attributed his condition to an injury at his timber-cutting job.
Dr. Toth opined
that Dr. Tynes should have taken a more thorough medical history and physical examination to determine the cause of the spasm;
that Dr. Tynes did not explicitly rule out that the left leg was swollen, which he could have done by measuring it; and
that Dr. Tynes should have taken a blood count to rule out an infection or an X ray to rule out a gas gangrene infection.
While Dr. Deitch opined that Allen's condition, as described in the October 24-25 hospital records, did not suggest a gas gangrene infection, he agreed that the records did not rule out that possibility.
Drs. Eddy and Deitch concluded that Allen did not have a clinically diagnosable gas gangrene infection on October 24-25. They said that the various tests recommended by Dr. Toth would not have detected the infection, either because the bacteria had not yet invaded the body or because the infection was still in the incubation stage. They found nothing in the records to warrant hospitalizing Allen for further observation.
Dr. Eddy said it was not improper to release Allen without a return appointment because muscle spasm often lasts for a week after an injury, even in the face of intravenous Valium and other muscle relaxants. Dr. Eddy disagreed with Dr. Toth's opinion that the simultaneous presence of muscle spasm in both sets of thigh muscles is unusual if the spasm is caused by muscle strain or a blow to one side of the leg.
According to Dr. Deitch, immediate hospitalization and early diagnosis would have increased Allen's chance of survival but would not have avoided the amputation. Because Allen had spasm in both the extension and flexion muscles in his thigh, Dr. Deitch assumed the early stage of the infection would have destroyed both types of muscle and that amputation would have been necessary even if the infection had been diagnosed sooner.
Dr. Eddy declined to opine whether early diagnosis would have allowed a more conservative treatment than amputation, explaining that he did not know whether the infection spread from the foot upward or from the rectum downward.
Dr. Toth concluded that the gas gangrene infection was in its early stages on October 25 and should have been clinically diagnosed, even if Allen was not disoriented or in acute distress, and did not have fever or a swollen leg. Dr. Toth based his conclusion on the combination of low blood pressure, indicating sepsis, and the severe intractable spasm in the leg muscles which are among the strongest muscles in the body. He considered the minimal relief from the Valium injection to be medically significant because the dosage and method of injection usually abolishes or greatly reduces muscle spasm for a half hour to several hours. Dr. Toth said the spasm could not have been caused by blunt trauma because it would have begun soon after the injury and would have been relatively short-lived. Allen did not experience muscle spasm in his leg until several days after the fall. Dr. Toth also noted that after the spasm began it grew progressively worse and more severe.
*910 In Dr. Toth's opinion, the onset, duration and increasing severity of the spasm should have been associated with an infection rather than with a traumatic injury. He opined that Dr. Tynes should have either admitted Allen to the hospital for observation, or consulted with a more experienced resident on call in the early morning hours, or had Allen wait until an experienced staff physician arrived at 8:00 a.m., or instructed Allen to see his doctor in Mansfield later on October 25. Any of these alternatives would probably have led to earlier diagnosis of the infection, according to Dr. Toth.
Dr. Toth said that although some tissue would have been destroyed even in the early clinically-apparent stage of the infection, the muscles would not have been in spasm if they had already been destroyed by an infection. Dr. Toth said the damage would not have been great enough to require amputation if the infection had been diagnosed sooner.

THE TRIAL COURT'S FINDINGS
The trial court found that Allen's leg was in severe spasm, but not necessarily swollen and discolored on his October 24-25 emergency room visit, as he and his family members testified. The court attributed the introduction of the bacteria to the work injury on October 19, finding there was no evidence of any later injury. The court considered all expert witnesses "eminently qualified," but concluded that the infection developed more slowly than it might have under other circumstances. These conclusions are reasonable in light of the fact that Allen had no readily visible skin wounds after the fall but obviously had some slight break somewhere in the skin of his leg to allow entry of the bacteria. A slight skin break was indicated because the infection did not rapidly appear after the injury. A larger and visible break would have allowed entry of more bacteria and more of an oxygen-free environment and a more rapid onset of the symptoms.
The court found the infection was clinically diagnosable on October 25 and that early diagnosis would have allowed for treatment less drastic than amputation. Dr. Tynes's care was found substandard because he did little or nothing to determine the cause of the severe spasm.
The court opined Dr. Tynes should have elicited more details about how the injury occurred and that Dr. Tynes probably would have been alarmed by the spasm's severity if he had known exactly how Allen injured himself.
The court specifically found Dr. Tynes's care to be substandard in that
he did not have [or take] current and reliable vital signs when he saw Allen at 3:30 a.m. October 25;
he did not order blood work to rule out sepsis which low blood pressure could have indicated;
he did not order X rays or other tests, admit Allen to the hospital for observation, order a follow-up visit, or consult with a more experienced doctor, even though he knew the spasm was not significantly relieved by either the October 25 Valium injection or by the muscle relaxant Allen had been taking since October 21.
There is a reasonable factual basis in the record for each of the trial court's conclusions, notwithstanding the contrary opinions of the defense experts.
The trial court's reasons show that the court considered and weighed each expert's testimony. The assessment and weight of conflicting testimony is the function of the trier of fact. On this record, we cannot say the finding of liability is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Compare factually White v. Edison, 361 So.2d 1292 (La.App. 1st Cir.1978), writ denied.
For the first time on appeal, the State contends Allen and his wife were comparatively negligent for not calling or returning to a doctor in Mansfield or in Shreveport until October 27 even though Allen's condition rapidly deteriorated after October 25. This affirmative defense was alluded to in the trial testimony but was not raised in the post-trial briefs and was not squarely addressed by the trial court.
*911 Even should we squarely consider this issue, we would not find comparative negligence. See Ouachita Nat. Bank in Monroe v. Williamson, 338 So.2d 172 (La.App. 2d Cir.1976).
Allen was bedridden after leaving LSUMC in the morning hours of October 25. Allen's wife, who is not the plaintiff, in any event, is not shown to have acted unreasonably. Dr. Tynes's instructions were for the Allens to return if any new problems developed. Allen's wife returned him to LSUMC when he became disoriented and his prior condition worsened. Dr. Tynes did not suggest to them on October 25 that they should immediately return in a matter of hours if Allen's leg pain became more severe.

GENERAL DAMAGES
The court awarded $225,000 in general damages, assigning these reasons:
[P]rior to this incident, Mr. Allen [age 41 at trial] was an active, hard-working, gregarious individual. Following the tragic loss of his leg, he is no longer able to engage in work or recreational activities and is deeply depressed. Additionally, he is unable to perform household chores. Mr. Allen has difficulty in engaging in sex with his wife ... [He] spent six weeks in the hospital when his leg was removed ...
The effect this entire matter has had on Mr. Allen is predictably overwhelming... He is a good, decent, hard-working man, devoted to his wife and well-liked in the community. Following the loss of his leg, he became, in the words of his wife, "a whole different person."
Mr. Allen will have to live with the loss of his leg for the rest of his life and will have to exert tremendous physical and psychological effort to maintain a reasonably "normal" quality of life.
Allen was in critical condition and in a great deal of pain when he was taken to LSUMC for the second time. During his six-week hospital stay, he had multiple surgeries: the amputation, at least four operations to debride muscle and irrigate the wound, and a skin graft to close the wound with skin from his other leg.
At trial over four years later, he was still periodically visiting the hospital with painful inflammations around the small opening that was left in his leg for drainage and for attention to and treatment of the "knots" formed by accumulated pus.
The combination of the recurring "knots" and the short (six-inch) stump make it impossible for Allen to wear a prosthesis. In his condition, he is not able to suspend and provide hip control of an artificial limb. He walks with crutches. He has difficulty driving and sitting comfortably, especially on the commode. He sometimes needs help getting in and out of the bathtub. As the trial court noted, it is not clear whether his inability to have sex with his wife results from a physiological or psychological problem, but in either case it is a consequence of the amputation.
Allen formerly enjoyed fishing, hunting, swimming, horseback riding, and dancing. He did many household chores, such as mowing the yard, painting, plumbing, and repairing appliances. He would sometimes cook, wash dishes, and iron. He can no longer do these things.
Allen has only a third-grade education. From age 12 until his injury at age 37, he worked steadily as a woodsman. His income and his wife's income from private sitting and nursing home work were sufficient to support them, his daughter, and his stepchildren. He now works for the DeSoto Association for Retarded Citizens, disassembling and cleaning telephone parts for AT & T, earning only $30-40 per week. He receives food stamps and $442 per month in social security disability benefits. His wife still works.
Allen's wife and a long-time friend described him as active at and away from work, well-liked, adjusted and happy before the amputation. After the amputation he is described as "down" or depressed and anxious about his physical and financial limitations.
The State contends the $225,000 general damage award is excessive. Allen argues *912 it is inadequate. We are not persuaded by either argument.
Our review of the factual basis for the award reveals no abuse by the trial court of its great discretion in assessing general damages. Neither litigant has articulably and demonstrably shown an abuse of discretion as required by Reck v. Stevens, 373 So.2d 498 (La.1979). Because the facts in this record support the general damage award, we need not compare it to general damage awards for similar injuries in other cases.

AWARDS DELETED
The court awarded $23,044 for lost future raises and $22,882 for lost homemaker services. These awards are speculative because Allen did not prove that future raises were expected in his timber-cutting work and did not prove or provide a factual basis for estimating the cost of paying others to perform the household chores he used to perform.
Allen was paid $4.50 per cord for cutting pulpwood and $1.25 per ton for cutting logs during the years 1980-1982. One-third of Allen's weekly remuneration was paid to him as rent for his equipment (truck, saws, etc.) he used to cut and haul wood. Allen worked for the same employer for many years before 1980. The bookkeeper who testified in 1987 did not have personal knowledge of how Allen's remuneration was specifically calculated before 1980, and was not asked what the 1987 rate of pay was for comparable production.
Allen's 1977-1982 tax returns show that he began receiving the rental income in 1979. There was no further explanation for the increase in his remuneration in 1979. The record simply does not show whether the increase is in the unit prices paid, is in volume, or is a combination of the two.
The evidence in this record also does not establish either the probability or the amount of "raises" in remuneration Allen might receive in the future. We must find that the trial court erred in awarding him $23,044 for lost future raises. See and compare Edwards v. Sims, 294 So.2d 611, 616 (La.App. 4th Cir.1974).
The evidence establishes that Allen is no longer able to perform household chores and maintenance as he did before, but does not specifically show or suggest the time or the labor cost of the services he performed. His wife testified she could not afford to have needed roof repairs done. She was not asked how much it would cost to have others perform such repair or other maintenance work.
The court's award of $22,882 for lost homemaker services is obviously based on the estimate of this loss by Allen's economist on the assumption that Allen spent $1,000 per year to have others perform the household chores he once performed. Dr. Harju only explained that the loss would be half as much if Allen spent $500 per year and twice as much if he spent $2,000 per year. Dr. Harju did not refer to time estimates or have any receipts, cancelled checks or other indication of how much Allen may have spent for replacement maintenance labor in the years since his injury. Dr. Harju simply assumed $1,000 per year as a hypothetical or "benchmark" figure.
Because it is seldom possible to prove the exact amount of a future loss, a trial court has discretion in calculating an award if it has evidence of both the need for, and the estimated cost of, the future services. See, for example, Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (La.1971); and Cushman v. Fireman's Fund Ins. Co., 401 So.2d 477 (La.App. 2d Cir.1981). Jordan allowed recovery for future nursing home care and Cushman upheld an award for future maid service.
Here, the need has been shown but the economist's calculation of the loss is based on a hypothetical figure and speculation without substantiation by any factual evidence.
On this record, we must find the trial court erred in awarding any amount for future maintenance services. Allen's loss of the enjoyment of occasionally doing household tasks such as ironing, cooking, painting, and other work inside and outside *913 his home is covered in the award of general damages.

LOST INCOME
A vocational rehabilitation counselor who evaluated Allen over three years after the amputation said:
In essence, we are dealing with a 39-year-old black male who has a below-the-hip amputation with a very short stump who cannot presently wear a prosthesis and who is mildly retarded. He is also a functional illiterate and lacks social skills that could be used in various kinds of jobs. His speech is so poor that he cannot always be understood. For that reason, he is, for all practical purposes, unemployable, and it is my opinion that he is functioning in the only type of job situation in which he could possibly function, that is, in a sheltered workshop where he is doing menial tasks at a rate of speed which would be acceptable in that kind of setting, but would not be acceptable in a regular work setting.
At the time of trial in 1987, Allen had a life expectancy of 28.7 years, a tabular work-life expectancy of 19.2 years, and an adjusted work-life expectancy (considering his race, sex, education, etc.) of 14.6 years.
Allen's tax returns show his income from 1977 through October 19, 1982. His income increased from about $4,000 in 1977-1978 to about $11,000 in 1979 and about $20,000 in 1980, dropping slightly to about $19,000 in 1981. His 1982 earnings totaled $18,700 through October 19. He would have earned about $23,500 in 1982 if he had continued working through December.
Allen's economist, Dr. Harju, estimated his annual earnings rate at $18,400 by averaging Allen's income from 1979 through 1982. Allen had been out of work for 4.92 years when the case was tried. His lost earnings for this period were about $90,000. Dr. Harju added seven percent of this figure, or about $6,000, as the value of social security contributions Allen's employer would have made on his behalf, and estimated his total past losses as about $96,000.
The same four-year income average was multiplied by the work-life expectancy of 14.6 years for a basic future loss, discounted to present value, of $235,500. Dr. Harju added 7.5 percent of this, or about $20,500, as lost social security contributions, for a total future loss of $256,000.
The trial court used a six-year average (1977-1982) rather than Dr. Harju's four-year average (1979-1982) to estimate Allen's annual income. The court multiplied the annual average of $13,751.90 by Allen's 4.92 years of past lost income and by his 14.6 year work-life expectancy for totals of $67,659.35 in past losses and $200,777.74 in future losses. The court reduced each figure by the amount of his past and future social security disability benefits ($442 per month) and awarded him $41,563.67 for past lost income and $123,339.84 for future lost income.
Allen contends the court erred in reducing the awards by the amount of his social security benefits and abused its discretion by using the six-year income average rather than the four-year average used by Dr. Harju. Even though the court based its average on figures introduced into evidence by Allen, the record is clear that the projection of Allen's annual earnings should be based on his owning and renting the equipment for the work and being paid accordingly as he had been since 1979. The four-year average, 1979-1982, is a more appropriate and realistic base to project Allen's earnings. Compare Detillier v. Scafco, Ltd., 507 So.2d 829 (La.App. 5th Cir.1987), writ denied.
We also agree that the awards should not have been reduced by the social security disability benefits. A Louisiana plaintiff's tort recovery is not diminished by the amount of benefits he receives from collateral sources to which the tortfeasor does not contribute. Weir v. Gasper, 459 So.2d 655 (La.App. 4th Cir.1984), writ denied. Weir recovered the full amount of her medical expenses even though most of them were paid by Medicare. The plaintiff in Swann v. City-Parish, 492 So.2d 1225 (La.App. 1st Cir.1986), received disability retirement benefits which were not deducted *914 from her award for future lost wages. The collateral source rule was also applied in Duree v. State, 96 So.2d 854 (La.App. 1st Cir.1957). There, the award to a minor child for loss of support from her deceased father was not reduced by the amount of life insurance and social security benefits she received.
Dr. Harju opined that Allen's earning losses totaled $352,000. The trial court opined that his gross losses would total $268,437.
We increase Allen's awards for lost past and future income to $275,000, an amount that will cause the judgment to reach the $500,000 cap or ceiling limitation of LRS 40:1299.39.

LEGAL INTEREST
Allen concedes he cannot recover damages beyond the $500,000 cap, but asks for legal interest on the total of his proven damages, which exceed $500,000. Allen cites Doty v. Central Mutual Insurance Company, 186 So.2d 328 (La.App. 3d Cir. 1966), writ denied.
Doty, a guest passenger, was awarded damages against the host driver and his liability insurer. Doty proved damages exceeding the insurer's policy limits. The policy obligated the insurer "to pay, in addition to the applicable limits of liability ... all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered ... [its policy limits]." The purpose of such policy language is to relieve the insured of his obligation to pay legal interest on the excess award during appellate delays caused by the insurer, who has control of the litigation. 186 So.2d at 334. When the insurer obligates itself to pay legal interest on the amount of the judgment that exceeds its policy limits, it will be cast for the supplemental interest from date of judgment until payment or tender of policy limits, on which legal interest is owed from date of judicial demand. Doty, supra.
If a liability policy excludes the payment of "interest on judgments" from the insurer's obligations, the insurer does not owe legal interest on the portion of the damage award that exceeds its policy limits. See O'Donnell v. Fidelity General Ins. Co., 344 So.2d 91 (La.App. 2d Cir.1977).
The purpose of LRS 40:1299.39 is to limit the liability of the employees of the State who render health care services and the liability of the State to a patient for medical malpractice. Williams v. Lallie Kemp Charity Hosp., 428 So.2d 1000, 1008 (La. App. 1st Cir.1983), writ denied.
... [N]o judgment shall be rendered ... for the injury ... of any patient in any action for an alleged act of malpractice in excess of $500,000 plus interest and costs, exclusive of future medical care... § 40:1299.39 B.
Notwithstanding that subsection G provides "coverage" for employees of the State and speaks of them as "named insureds," the statute's purpose is to benefit the state and its employees by limiting the damages that a patient may be awarded for medical malpractice. It is not necessary to enumerate the exact amount that a patient might have been awarded in damages over and above the statutory limitation. Williams, supra, p. 1012-3.
The statute clearly allows interest on the $500,000 maximum award and does not contain language as in Doty, supra, to allow recovery of interest on the entire amount of a patient's damages if they exceed $500,000. In this respect, the statutory language must be distinguished from the liability policy language interpreted in Doty and O'Donnell, supra.
The legislature limited the state's liability for the negligence of its health care providers to lower the cost of health care services generally and to assure the availability of medical care for citizens who depend upon the free or inexpensive medical services provided by the state for their medical treatment. Williams, supra.
The statute is not ambiguous with respect to the limitation (no judgment against the State shall be rendered for malpractice in excess of $500,000 plus interest) and we have not been referred to any statutory language that would allow us to limit the *915 judgment to $500,000 principal and yet award interest on damages in excess of $500,000.
We therefore construe the statute in its clear context and perhaps "blunt and crude" approach or purpose (Williams, supra, p. 1012), and hold that interest on damages in excess of the $500,000 total award may not be assessed.

DECREE
Allen did not include past medical expenses at LSUMC in his petition or prayer. He was awarded the cost of future medical care, in addition to damages, interest, and costs, in the judgment.[1]
We amend the judgment to a total of $500,000 in these respects:
by deleting the awards for future "raises" in remuneration and for lost homemaking services ($45,926 total);
by increasing the award for past and future loss of earnings to $275,000; and
to change all references in the judgment from LRS 40:1299.43 to LRS 40:1299.39.
In all other respects the judgment is affirmed, at the cost of the State.
AFFIRMED AS AMENDED.
NOTES
[1] The judgment awards "future medical care in accordance with LSA-R.S. 40:1299.43." That statute applies in malpractice claims against private health care providers. § 40:1299.39 governs future medical care in cases against the State. We shall amend the judgment to correct this inadvertent reference.